Argued and submitted February 27, vacated and remanded for further proceedings December 31, 2008, both petitions for review allowed June 9, 2009 (346 Or 257)
See later issue Oregon Reports

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CHARITY ANN ASHBAUGH,
*Defendant-Appellant.*

Washington County Circuit Court
C052367CR; A131117

200 P3d 149

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. With him on the brief were Ingrid Swenson, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Stacie F. Beckerman, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy

Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

SCHUMAN, J.

Brewer, C. J., concurring.

Landau, J., concurring in part and dissenting in part.

Edmonds, J., dissenting.

## SCHUMAN, J.

Defendant was convicted of unlawful possession of a controlled substance. On appeal, she assigns error to the trial court's denial of her motion to suppress evidence obtained after she consented to a search of her purse. She argues that her consent, and therefore the discovery of the evidence, derived from a violation of her right under Article I, section 9, of the Oregon Constitution[1] to be free from unreasonable searches and seizures. The state concedes that police officers detained defendant in violation of her constitutional right when, without reasonable suspicion, they required her to provide identification and then called in a "warrant check." The state argues, however, that the relationship between that unlawful conduct and the discovery of the evidence does not support a suppression remedy. We agree. However, defendant further argues that a subsequent encounter was also an unlawful stop, and that it, too, led to the discovery of the evidence. We conclude that the second encounter may have been unlawful, depending on facts that neither party developed at trial, and that the second encounter did lead to discovery of the evidence. We therefore remand to the trial court for further factfinding.

The undisputed facts are as follows. While patrolling a public park on their bicycles in the early afternoon, Beaverton Police Officers Barrowcliff and Schaer noticed defendant and her husband sitting on the ground in the shade of a tree. Because the couple were "middle-aged," they "didn't look like older people or people with kids" who frequented the park, and that fact aroused the officers' suspicion. One of the officers told the couple, "Hey, you're not in any trouble; do you have some I.D. we can see?" Defendant and her husband cooperated with the request, and the officers took their identification to check for warrants.

After a few minutes, the officers learned that defendant had no outstanding warrants, and they returned her identification to her. The check on her husband, however,

---

[1] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

revealed that defendant had a valid restraining order against him. Defendant acknowledged the existence of the restraining order but told the officers that she and her husband were trying to repair their relationship. The officers nonetheless arrested the husband for violating the order and called for a transport vehicle. While he was being handcuffed, defendant's husband asked, within earshot of defendant, if defendant could take his belongings with her. The officers said that she could. Defendant's conversation with the officers was "relaxed and nonconfrontational"; she knew that she was not being detained.

The officers led defendant's husband to a patrol car approximately 40 feet from where defendant stood. A few minutes thereafter—and 18 minutes after the officers first approached the couple—the officers went to retrieve their bikes. Defendant was still there. They asked her if she would take her husband's belongings. At that point, "something inside of [Schaer] made [him] want to ask" defendant if she had anything illegal in her purse, and he did so. Defendant told him that she did not. Schaer then asked if he could look inside her purse, and she consented. That conversation was also "relaxed and nonconfrontational." Schaer looked inside the purse and found methamphetamine.

Defendant was charged with unlawful possession of a controlled substance. *Former* ORS 475.992(4) (2003), *renumbered as* ORS 475.840(3) (2005). In a pretrial motion to suppress, she argued that her initial interaction with the officers amounted to an unlawful stop and that the evidence had to be suppressed because the officers discovered it as a result of that violation of her rights. In the alternative, she argued that a separate unlawful stop occurred when, after putting defendant's husband in the police car, the officers approached her again and Schaer asked for permission to search her purse. The trial court denied her motion, concluding that the original stop became unlawful when the officers took the identification and began a warrant check, but that the relationship between that unlawful activity and the discovery of the evidence did not support suppression. The court also implicitly rejected the alternative argument that the second encounter was a stop. After a trial to the court on stipulated facts, defendant was convicted.

On appeal, defendant renews the arguments that she made at trial. The state concedes (as it did at trial) that the officers violated Article I, section 9, when, without reasonable suspicion of criminal activity, they asked for and retained defendant's identification and conducted a warrant check.[2] We agree and accept that concession. *See State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) (stop occurs when officer retains identification and conducts radio warrant check). The state argues, however, that any causal connection between that illegality and defendant's consent is too tenuous to require suppression because "the stop had ended, significant time had elapsed, and defendant was not the focus of the investigation but rather the victim of a crime." The state further argues that Schaer's questioning regarding the contents of defendant's purse did not constitute a separate unlawful stop because such a request, without more, does not elevate a police-citizen encounter to the level of a seizure so as to trigger constitutional protection.

First, we address defendant's argument that the evidence should have been suppressed because it derived from the first encounter: the concededly unlawful stop that occurred when the officers took defendant's identification to check for warrants. The critical inquiry in determining the nature of the relationship between unlawful police conduct and evidence that a defendant seeks to suppress is "whether the state obtained the evidence * * * *as a result of* a violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 24 (emphasis added). The Supreme Court has provided the analytical framework for resolving that inquiry:

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into

---

[2] Defendant also argues that the trial court's ruling violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution. Her three-sentence argument, however, fails to present any "thorough and focused constitutional analysis." *See State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (refusing to address constitutional claims in the absence of such an analysis). Accordingly, we decline to address her federal claim.

the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent."

*Id.* at 34-35.

In order to establish a "minimal factual nexus," the defendant must show that there is at least a "but for" relationship between the unlawful stop and the consent. *Id.* at 25. The burden then shifts to the state. If the state cannot establish "independence"—that is, that the evidence inevitably would have been discovered through the exercise of lawful procedures (such as a mandatory inventory policy), or that it was obtained not only as a result of the illegality, but also as the result of a chain of events that did not include an illegality (that is, an "independent source")—it must prove "attenuation." *State v. Tyler*, 218 Or App 105, 110, 178 P3d 282 (2008). Factors on which the state might rely to make that showing include the amount of time that elapsed between the illegality and the request for consent and the presence of any intervening or mitigating circumstances. *Id.*

In accordance with those principles, we must first determine whether defendant has established the requisite "but for" relationship. *Hall,* 339 Or at 25. We have explained that relationship, albeit in the civil context, as follows: one event is the "but for" cause of a second event if the second event would not have occurred if the first event had not occurred. *Wallach v. Allstate Ins. Co.*, 206 Or App 137, 143, 135 P3d 404 (2006), *aff'd*, 344 Or 314, 180 P3d 19 (2008); *see also Blacks Law Dictionary* 213 (8th ed 2004) (defining "but-for test" as "[t]he doctrine that causation exists only when the result would not have occurred without the party's conduct"). The state asserts that, although the request for consent occurred after the unlawful stop, defendant has failed to show that the request occurred as a result of it. Defendant's position is that, if her interaction with the officers had ended before they took her identification and began a warrant check, the subsequent series of events culminating in the officers' request for consent to search would never have occurred. Instead, the encounter would have ended and, presumably, the officers would have moved on.

■    Defendant's theory does not withstand scrutiny. The officers' retention of defendant's identification and subsequent warrant check had no causal relationship with the discovery of evidence; that check came back negative, at which point defendant was free to leave. The warrant check that was causally related to the discovery of evidence was the one that police carried out on defendant's husband; that act, a violation of *his* rights, led to the discovery of the outstanding restraining order, the arrest, and the subsequent events. The violation of *defendant's* rights simply had no downstream consequences. The fact that there might have been a "but for" connection between the violation of her husband's rights and the discovery of the evidence does not avail defendant; the suppression remedy serves only to restore a person to the position she would have been in if her rights had not been violated. *State v. Tanner*, 304 Or 312, 315-16, 745 P2d 757 (1987). We therefore conclude that the original stop, although unlawful, does not require suppression of the methamphetamine.

Alternatively, defendant argues that a separate unlawful stop occurred after her husband had been arrested and taken away in a police vehicle, when Schaer, prompted only by "something inside of [him]," asked her if she had any contraband in her purse and, when she said that she did not, asked for consent to search it. The state, apparently conceding that the connection between that encounter and the discovery of the evidence was immediate and direct, responds that the encounter did not amount to a stop for purposes of triggering constitutional protections.

■    We must therefore confront once again the vexing question of when an encounter between a police officer and a citizen becomes a stop. In *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), the Supreme Court held that a person is "seized" for purposes of Article I, section 9, and therefore stopped,

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

The court determines whether a stop of the first type—type (a)—has occurred without reference to the subjective belief of the defendant; the only relevant state of mind is the officer's. A type (b) inquiry examines the defendant's subjective belief and then, if the necessary belief is found, evaluates its reasonableness. *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998). Both inquiries are informed by the court's elaboration on the circumstances under which it regards an individual's liberty of movement to have been significantly restrained:

> "[An encounter] is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Holmes*, 311 Or at 410.

In *Holmes* itself and most of the cases using its analysis to determine whether a stop has occurred, the court has emphasized the definitional element without addressing the subjective elements; that is, the court's analysis has focused on whether the encounter transcended the bounds of ordinary social intercourse, without addressing the state of mind of either the officer or the defendant. The court has mentioned the defendant's state of mind, a necessary element in a type (b) analysis, in only two cases, *Toevs*, 327 Or at 536, and *State v. Dahl*, 323 Or 199, 208, 915 P2d 979 (1996). In no case has the court mentioned the officer's intent, a necessary element in a type (a) analysis, perhaps because in certain circumstances that intent is so obvious that there can be no issue regarding it. *See, e.g., State v. Thompkin*, 341 Or 368, 371-73, 143 P3d 530 (2006) (officer takes and retains the defendant's identification to run a warrant check); *Hall*, 339 Or at 10-11 (same); *Dahl*, 323 Or at 201-03 (officer commands the defendant to exit house with hands raised); *Holmes*, 311 Or at 402-03 (officer flags down motorist).

Here, defendant presented the trial court with an argument to which a type (b) analysis might apply; she asserted that any reasonable person "would feel stopped in defendant's situation." We therefore apply the analysis that

the court used in *Toevs*, where the court explained its "general methodology for determining whether an officer's contact with a citizen rises to the level of a stop." 327 Or at 534. That methodology focuses entirely on *Holmes* type (b) stops:

> "The court in *Holmes* held that a 'seizure,' which includes a stop, occurs under Article I, section 9, whenever a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* such a belief is *objectively reasonable* under the circumstances."

*Toevs*, 327 Or at 535 (emphasis in original). Noting that "the record demonstrates that the court found that defendant subjectively believed" that his freedom of movement was restricted, the court went on to "conclude that a reasonable person in defendant's position could have believed that the officers significantly had restricted his liberty or freedom of movement." *Id.* at 536.

■    Where, as here, a defendant moves to suppress evidence seized as the result of a warrantless search, "the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution." ORS 133.693(4); *see also State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). Thus, when defendant challenged the validity of the warrantless search in this case, the state was required to demonstrate that the search was not tainted by an unlawful stop, that is, an unlawful seizure of defendant's person. That demonstration, in turn, required the state to prove that defendant did not believe that Schaer had limited her freedom to leave during her second encounter with him. However, neither the state, defendant, nor the trial court focused on the issue of defendant's subjective belief.[3]

Because the trial court did not address that issue in the first instance, we remand the case for that determination. *See Toevs*, 327 Or at 535 (requiring a fact-specific inquiry into

---

[3] Possibly, the parties and the court *presumed* that defendant did not believe that she was free to leave because, if she *had* believed that, she *would* have left—knowing, as she must have, that she had contraband on her person.

the totality of the circumstances to determine whether "a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* [whether] such a belief is *objectively reasonable* under the circumstances") (emphasis in original); *State v. Puffenbarger*, 166 Or App 426, 433-34, 998 P2d 788 (2000) (same). The question before the trial court on remand is whether the second encounter between defendant and the officers constituted a seizure under the type (b) *Holmes* analysis. Again, that determination requires two distinct assessments, only one of which remains open: whether defendant subjectively believed that the officers significantly restricted or interfered with her freedom of movement. *Toevs*, 327 Or at 535. That issue has not yet been addressed in this case.

██ ██ If the trial court determines that defendant did so believe, the remaining question is whether "such a belief is *objectively reasonable* under the circumstances," that is, whether "a reasonable person in defendant's position *could have believed* that the officers significantly had restricted [her] liberty or freedom of movement." *Id.* at 536 (first emphasis in original; second emphasis added). That question, though, is a legal issue, *id.* at 535-36, and we here conclude that if, in fact, defendant believed that she was not free to leave, that belief was reasonable under the circumstances. Although her conversation with the two officers was "relaxed and nonconfrontational," it was a conversation between one citizen and two uniformed, armed police officers who had, within the previous 20 minutes, required her to produce identification; had, as she watched, arrested her husband, handcuffed him, and put him in a patrol car for transportation to jail; had approached her again and asked if she was carrying contraband; and, obviously not believing her denial, had asked to search her purse. If, in those circumstances, she believed that she could not refuse the request and leave, that belief was a far cry from unreasonable.

The dissent disagrees. At one point, the dissent contends that "a noncoercive conversation between a citizen and a police officer does not offend the constitutional prohibition

against unreasonable searches and seizures, even if the conversation includes a request for permission to search a person or the person's belongings." 225 Or App at 37 (Edmonds, J., dissenting). In support of that sweeping proposition, the dissent cites *State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 842 P2d 807 (1992). However, as the dissent subsequently observes, *Fikes* holds merely that the defendant's belief in that case was "not objectively reasonable *under the circumstances.*" *Id.* at 622 (emphasis added). Thus, we conclude that the dissent agrees with us (and with the Supreme Court in *Toevs*, 327 Or at 535, and *Holmes*, 311 Or at 408) that whether a particular defendant's belief is objectively reasonable depends on the particular circumstances of the case.

The dissent relies primarily on the precedent established by *Fikes*. That case, however, provides no reason to affirm here, for two reasons. First, it was wrong when it was decided. The defendant, a juvenile, was startled by a uniformed and armed police officer who approached him from behind, informed him that there had been complaints about drug use in the area, and then asked him for permission to search his person. *Fikes*, 116 Or App at 620. The court held that, if the defendant believed that he was not free to ignore the request and leave, that belief was unreasonable. *Id.* at 622. That conclusion might make sense to those of us who are schooled in the nuances of search-and-seizure law, but to everybody else, it is fanciful.

Second, the *Holmes*-derived analysis that we applied in *Fikes* has been significantly reformulated by the Supreme Court, most notably in *Hall*.[4] In that case, the court, after reviewing its earlier cases (including *Holmes, State v. Warner*, 284 Or 147, 585 P2d 681 (1978), and *State v. Painter*, 296 Or 422, 676 P2d 309 (1984)), determined that a police-citizen encounter is a stop if the encounter could cause a person reasonably to believe that he or she was the subject of a criminal investigation and, for that reason, that his or her liberty of movement had been significantly restricted. *Hall*,

---

[4] That reformulation also requires us to disavow earlier cases, insofar as they are inconsistent with this one.

339 Or at 17-19. The court held that the defendant was seized when an officer requested and retained the defendant's identification, promptly returned it, and then ran a warrant check. The court explained:

> "In this case, [Officer] Deese's initial actions of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement, because, even if Deese inconvenienced defendant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' *Holmes*, 311 Or at 410. When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement. It is true that * * * Deese promptly returned defendant's identification card. Nevertheless, when Deese did so, defendant was cognizant that Deese was investigating whether defendant was the subject of any outstanding warrants. *Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check.*"

339 Or at 19 (emphasis added).

Subsequently, we have repeatedly held that, when a police officer obtains a person's identification and uses it to check for outstanding warrants or probation violations, the person has been stopped. *E.g., State v. Campbell*, 207 Or App 585, 589, 142 P3d 517 (2006); *State v. Harper*, 197 Or App 221, 236, 105 P3d 883 (2005). More recently, in *State v. Highley*, 219 Or App 100, 102-03, 180 P3d 1230 (2008), we held that a seizure occurred when a police officer asked the defendant, a car passenger, if he was on probation, thereafter requested and retained the defendant's driver's license, recorded the information from the license in a notebook, returned the license, and then immediately walked to his police vehicle. We explained that

> "a reasonable person whose identification information has been written down by a police officer who has just inquired about the person's probationary status would * * * understand that he or she was the subject of an investigation

> [because that person] * * * would believe that the officer wrote down the identifying information and then immediately returned to his car * * * in order to run some type of records check."

*Id.* at 108. We stressed that neither the retention of a suspect's identification, nor the length of the retention, determines whether a seizure has occurred. *Id.* at 109. The proper question is whether the defendant believes that he or she is under investigation and is thus not free to leave, and whether that belief is reasonable. *Id.*; *accord State v. La France*, 219 Or App 548, 554, 184 P3d 1169 (2008). Although *Hall* and our subsequent cases deal specifically with warrant checks, the underlying principle is that a person who knows that he or she is being investigated by a police officer during an encounter could reasonably believe that, for that reason, his or her freedom of movement has been restrained. We see no meaningful distinction between situations in which awareness of the investigation derives from a warrant check (with or without the retention of the defendant's identification, and regardless of the police officer's degree of courtesy) and those in which the awareness derives from a request to search following a defendant's denial of wrongdoing (regardless of whether the request is polite). In this case, if defendant believed that Schaer's questioning and his request to search her purse limited her freedom of movement, that belief was reasonable.

As explained above, we are unable on the current record to determine whether defendant had that belief. We therefore remand to the trial court for such a determination. If the court finds that defendant did not believe that she was the subject of a criminal investigation and was therefore unable to leave, the court should reinstate defendant's conviction. If the court determines that defendant did subjectively hold that belief, however, the evidence found in defendant's purse must be suppressed.

Vacated and remanded for further proceedings.

Haselton, Armstrong, and Ortega, JJ., join in this opinion.

**BREWER, C. J.,** concurring.

I agree with the majority's analysis of this case with respect to defendant's first encounter with the police officers, and I agree with its conclusion that this case should be remanded for a determination whether defendant's second encounter with the police constituted an unlawful stop. I respectfully disagree, though, with portions of its analysis concerning the second encounter.

I take primary issue with the majority's conclusion that the Supreme Court's decision in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), effected a signal change in the jurisprudence pertaining to whether police-citizen encounters constitute unlawful stops under Article I, section 9, of the Oregon Constitution. This court, like the Supreme Court, unanimously concluded in *Hall* that the encounter in that case amounted to an unlawful stop in the absence of reasonable suspicion of criminal activity. In fact, this court's treatment of that issue was entirely consistent with the Supreme Court's analysis. *Compare* 183 Or App 48, 62, 50 P3d 1258 (2002), *with* 339 Or at 16-19. Nor have this court's unlawful stop cases decided before *Hall* necessarily become counterfeit in the wake of that decision. To the contrary, our previous unlawful stop decisions, which, together with earlier Supreme Court decisions, formed the foundation for this court's decision in *Hall*, generally are consistent with the Supreme Court's decision in *Hall*. *See, e.g., State v. Smith*, 73 Or App 287, 292, 698 P2d 973 (1985) (holding that "the use of defendant's identification to check for arrest warrants constituted a show of authority that would lead a reasonable citizen in defendant's circumstances to believe that he was not free to leave unless the warrant check came back clear[,]" even when the actual identification itself had been returned to the defendant).

Which brings me to *State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 842 P2d 807 (1992), a case over which the majority and dissenting opinions sharply divide. Unlike the majority, I do not believe that *Fikes* necessarily was wrong when decided or that it is wrong in light of *Hall*. *Fikes*, consistently with the Supreme Court's decision in *State v.*

*Holmes*, 311 Or 400, 410, 813 P2d 28 (1991), drew a distinction between police-citizen encounters that are noncoercive and conversational, even though the police may be following up on a mere hunch that criminal activity is afoot, and those that, through a show of authority or force, significantly exceed the bounds of socially tolerable conduct from the standpoint of an ordinary citizen. As amplified below, the problem, if any, with our decision in *Fikes* is inherent in the application of the *Holmes* test, which places a reviewing court in the position of channeling what a reasonable person in the defendant's position could (or would) believe regarding whether he or she was free to leave during an encounter with police. Although the majority disagrees with our conclusion in *Fikes*, if we erred, it is because the *Holmes* test is inherently difficult to apply in a predictable and consistent way.

However, unlike the dissent, I would readily distinguish the circumstances of this case from those in *Fikes*. Here, as the majority observes—in contrast to the circumstances in *Fikes*—there was a transactional history between defendant, her husband, and the inquiring officers that reasonably could have affected defendant's belief as to whether she was free to go during the second encounter. 225 Or App at 25. Many people in defendant's shoes would not have regarded the second encounter, which was laden with the implications of that history, as "mere conversation."

When defendant challenged the validity of her consent to the search in this case, the state was required to prove that her consent was not tainted by an unlawful seizure. ORS 133.693(4); *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). Because defendant made a second category stop argument under *Holmes*,[1] the state was required to prove that defendant subjectively believed that she was free to go during her second encounter with the police. If defendant did so believe, the court must make the legal determination whether "a reasonable person in defendant's position *could have believed* that the officers significantly had restricted

---

[1] By the term "second category stop," I refer, as does the majority, to the situation where an individual subjectively believes that a law enforcement officer has significantly restricted, interfered with, or otherwise deprived the individual of liberty of movement and such belief is objectively reasonable in the circumstances. *Holmes* 311 Or at 409-10.

[her] liberty." *State v. Toevs,* 327 Or 525, 536, 964 P2d 1007 (1998) (emphasis added). Unlike the former determination, the latter is one to which a reviewing court owes no deference. Accordingly, I do not hesitate to express my view of the matter on this record.

The *Holmes* test treats the "reasonableness" determination in second category stop cases as a legal exercise. In cases like *Hall,* where the court found "it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check," 339 Or at 19, the determination can be relatively straightforward. However, we are not a homogeneous society when it comes to our perceptions of the varied and complicated spectrum of police-citizen interactions. Some ordinary people in defendant's position during the second encounter in this case reasonably might feel "seized," whereas, due to the officer's low-key and conversational request, others might not. Bluntly, the division between the majority and dissent in this case reflects that tension. For that reason, it is important to know if the operative test is whether, in the given circumstances, "a reasonable person *could have believed* that the officers significantly had restricted [her] liberty," *Toevs* 327 Or at 536, or if, in any given set of circumstances, there is only one cognizably reasonable perception as to whether the defendant was free to leave, *see Holmes*, 311 Or at 410 (the pivotal consideration is whether "the officer, even if making inquiries a private citizen would not, has otherwise conducted [himself or herself] in a manner that *would be perceived* as a nonoffensive contact if it had occurred between two ordinary citizens") (emphasis added). In my view, the circumstances of this case—like many others in the real world—likely would not produce a uniform perception among all ordinary citizens as to whether defendant was free to leave during the second encounter.

Insofar as I am aware, the implications of that choice have not been explored in any published appellate decision to date. If the *Toevs* formulation is controlling, in cases like this one the determination of whether a seizure occurred would depend on the trial court's findings as to the defendant's subjective belief. Such a prospect is arguably inconsistent with

the goal of producing predictable and consistent results in cases involving similar circumstances. On the other hand, if courts are meant to determine how a hypothetically reasonable person would—that is, must—be deemed to have perceived an encounter with police in a given set of circumstances, arbitrary results that do not accurately mirror the diversity of ordinary societal perceptions may ensue. In short, the unsatisfactory implications of both alternatives reflect the difficulty that inheres in applying a reasonable person standard to reach legal conclusions, rather than to make the traditionally factual determinations associated, for example, with the use of that standard in civil negligence cases.

Although the issue is not free from doubt, I take the Supreme Court at its word in *Toevs* that it is enough to satisfy the objective prong of the second *Holmes* category that a reasonable person in defendant's position *could*, in the pertinent circumstances, believe that the officers significantly had restricted her liberty. *See, e.g., State v. Turner*, 221 Or App 621, 625-26, 191 P3d 697 (2008) (citing *Toevs* for the proposition that, "whether a stop has occurred depends, in part, on whether a person in the defendant's circumstance could reasonably have felt that he was not free to leave"). Because that is the circumstance here, I, like the majority, would remand solely for the trial court to determine defendant's subjective belief. If the court finds that defendant subjectively believed she was not free to go, that belief was objectively reasonable; accordingly the court should grant defendant's motion to suppress. On the other hand, if the court finds that defendant believed that she was free to go, the court should deny defendant's motion.

I respectfully concur.

Wollheim and Rosenblum, JJ., join in this concurrence.

**LANDAU, J.,** concurring in part and dissenting in part.

I agree, for the reasons stated in the majority opinion, that the case must be remanded for findings about whether defendant believed that she had been detained.

Because a finding on remand that defendant, in fact, believed that she was not detained would end the matter, the balance of the majority's opinion is *dictum*. I express no opinion about the majority's—or the concurrence's or the dissent's—views about whether a reasonable person could feel detained under the circumstances.

**EDMONDS, J.,** dissenting.

The lead opinion's interpretation of Article I, section 9, in this case has far-reaching implications on how law enforcement agencies throughout the state conduct drug-related inquiries of private citizens in all types of circumstances—whether it be an encounter between a police officer and a citizen in a public place or whether an officer contacts a citizen at the citizen's private residence and requests consent to search the citizen's premises. The majority holds that a noncoercive conversation between a police officer and a citizen during which the officer asks for consent to search constitutes a "seizure" of the person. For the reasons discussed below, I disagree with the majority.

The majority remands to the trial court for a determination of whether defendant subjectively believed that her liberty or freedom of movement was interfered with when the officers contacted her a second time and after the officers had arrested her husband for a violation of a Family Abuse Prevention Act restraining order. It holds that, under the circumstances of this case, if she believed that her liberty was being interfered with, that belief was objectively reasonable and that she was "seized" for purposes of Article I, section 9. The lead opinion's conclusion is inconsistent with the trial court's findings and with a proper interpretation of existing precedent under Article I, section 9.

The trial court found that defendant's identification was returned to her at 2:17 p.m. It also found,

"The police arrested and handcuffed the husband. Within ear shot of his wife, the husband asked the officers if she [defendant] could take his bike and backpack. [Officer] Baroncliffe said that she could. All four also discussed the restraining order situation. The wife explained that she and her husband had problems in the past, but they were

trying to work things out and were living together. *The defendant knew she was not being detained.*

"The conversations between the police and the Ashbaughs were relaxed and nonconfrontational.

"At 2:30, both officers escorted the husband to a patrol vehicle that had arrived. They walked with their backs to the defendant as they went from the park to the public street about forty feet away. The defendant observed the activity.

"At approximately 2:33, the officers walked back to the area where the defendant remained. Schaer intended to ask the defendant if she would take her husband's bicycle and backpack. The officers also needed to retrieve their own bikes. The officers did not suspect Ms. Ashbaugh of any wrongdoing.

" *'Something just made' Schaer 'want to ask' the defendant if she had anything illegal in her purse, and he asked her that question. She responded no. The officer then inquired if he could look through her purse, and the defendant said yes. Again the conversation was relaxed and nonconfrontational.*

"The search and arrest occurred as Officer Schaer described. The arrest took place at 2:40."

(Emphasis added.)

As a reviewing court, we are bound by a trial court's historical finding if supported by the evidence in the record. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Under the consent exception to the search warrant requirement in Article I, section 9, of the Oregon Constitution, the suppression of evidence obtained during a consent search may be necessary to vindicate a defendant's rights that were violated by earlier police conduct. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). Thus, Article I, section 9, may require exclusion of evidence from an otherwise voluntary consent on the ground that the consent is derived from a preceding violation of the defendant's rights under the state constitution. *State v. Hall*, 339 Or 7, 20-21, 115 P3d 908 (2005). Here defendant argues, in part, that her freedom or liberty of movement was unlawfully restricted when the officers

approached her on a second occasion and engaged in a conversation with her. Before that time, the trial court found—and there is evidence to support the finding—that defendant knew she was not being detained.

The evidence shows that, when the officers returned to defendant's location, Officer Schaer initially asked her if she would take her husband's belongings. In the abstract, the tests for whether a seizure of defendant occurred at that point in time are as the majority recites: "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991) (footnote omitted). Presumably, the majority and I agree that no seizure occurred under either test when the officers approached defendant and asked her whether she was willing to take possession of her husband's belongings.

After Schaer asked the above question, he asked defendant if she had anything illegal in her purse, and when she said, "no," he asked whether he could search her purse. To that inquiry, defendant replied, "yeah, sure." The majority agrees that Schaer's questions were not an attempt to exploit the earlier unlawful retention of defendant's identification. Rather, the majority applies a *Holmes* type (b) analysis and concludes that a reasonable person could believe his or her liberty or freedom of movement was being restricted because of Schaer's questions and that the only remaining issue is whether defendant held the subjective belief that she was being detained. On that question, the majority remands to the trial court.

The lead opinion errs by requiring that a *Holmes* type (b) analysis be applied in this case on remand. The *Holmes* court could not have intended a type (b) test to be applied where there is no evidence in the record of what defendant believed regarding her freedom to decline the officer's requests and to leave their presence. Importantly, defendant did not testify at the hearing, and I am aware of no evidence in the existing record from which a trier of fact could

draw a reasonable inference regarding her subjective state of mind. Thus, on remand, the trial court has no evidentiary basis on which to make the finding required by the remand. Even if the evidentiary record is reopened on remand, the state cannot compel defendant to testify regarding her state of mind at the time that she was asked for her consent to search her purse. Admittedly, it is unclear what circumstances the *Holmes* court had in mind when it interpreted Article I, section 9, to embody a type (b) analysis, but the court could not have contemplated a process where the state is effectively unable to litigate the issue that has been framed by the majority as determinative of the outcome of this case and where the trial court is required to make a finding that is impossible for it to make.

Because a type (b) analysis is not applicable to the circumstances of this case, the only remaining issue is whether Schaer's questions about whether defendant had anything illegal in her purse and whether she would consent to a search of her purse were *unlawful* under a *Holmes* type (a) analysis. No statute prohibits Schaer from asking defendant to consent to a search, and the trial court expressly found that the questions were not asked in a coercive manner.[1] Because there is evidence to support the trial court's finding in that regard, this court is bound by it. Consequently, Schaer's questions can only be deemed unlawful if they significantly interfered with defendant's freedom or liberty of movement in violation of Article I, section 9, because of their content. In other words, did Schaer's questions regarding whether defendant had anything illegal in her purse and whether he could look through her purse operate to seize her person unlawfully?

Whether defendant's liberty of movement was significantly interfered with by Schaer is a question of law based on the totality of the factual circumstances. *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998). Under Article I, section 9, "law enforcement officers may approach persons on the street or in public places, question them, and even accompany them to another location without the encounter

---

[1] The trial court found with regard to the second contact: "Again the conversation was relaxed and nonconfrontational."

necessarily constituting a 'seizure' of a person under Article I, section 9." *Holmes*, 311 Or at 409. "A street or public place encounter does not amount to an Article I, section 9, 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer." *Id.* at 410.

> "Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, *even if making inquiries a private citizen would not,* has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Id.* (emphasis added). Here, although Schaer made inquiries of defendant that a private citizen would not have made, he engaged in only a noncoercive conversation in a manner that would not be perceived as offensive had the conversation occurred between two ordinary citizens. Nonetheless, the majority holds that the officer's questions imposed an unlawful restraint on defendant's freedom of movement. But the proper interpretation of Article I, section 9, is that a noncoercive conversation between a citizen and a police officer does not offend the constitutional prohibition against unreasonable searches and seizures, even if the conversation includes a request for permission to search a person or the person's belongings. *See also State v. Dahl*, 323 Or 199, 915 P2d 979 (1996).[2]

In fact, this court has specifically rejected the lead opinion's reasoning in *State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 622-23, 842 P2d 807 (1992). *Fikes* involved facts closely analogous to this case. An officer approached the youth on the street and told him of neighborhood complaints of drug activity. The officer then asked him for consent to search the youth's person, and the youth responded, "Yeah,

---

[2] In *Dahl*, the court observed that it had previously identified three distinct categories of police-citizen encounters along the continuum of contacts between police officers and citizens under Article I, section 9. The court described the first category of encounters as mere conversations where there is no element of coercion and held that such encounters do not constitute "seizures" within the meaning of the constitution. Such encounters between police and citizens require "no justification." 323 Or at 206.

go ahead." We explained, relying on *Holmes*'s identification of categories of encounters between police and citizens, that, although the officer's

> "request to search was not an inquiry that one private citizen would usually make to another, he otherwise conducted himself in a manner that would be perceived as a nonoffensive contact between two citizens. Although he was wearing a uniform, [the officer] took no coercive action of any kind."

*Id.* at 623. Accordingly, we held that, "even assuming that [the] child believed that he was not free to leave, * * * *that belief was not objectively reasonable under the circumstances.*" *Id.* at 622 (emphasis added).

Based on the principle of *stare decisis*, our interpretation of Article I, section 9, in *Fikes* is controlling in this case. Thus, the majority is forced to assert that *Fikes* "was wrong when it was decided," particularly in light of its understanding of the holding in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). 225 Or App at 26. However, the lead opinion's claim—that *Hall* has implicitly overruled *Fikes*—should be considered carefully in light of the issue that was actually decided in *Hall*.

In *Hall*, the trial court relied on the holding in *Fikes* in making its ruling on the defendant's motion. *See Hall*, 339 Or at 11 n 4. Although the Supreme Court reversed the trial court in *Hall*, it reversed on a different basis than on which *Fikes* was decided. The facts in *Hall* demonstrate that proposition. The officer in *Hall* stopped his vehicle next to the defendant, who was walking along a street. The officer then gestured to the defendant to approach him. When the defendant approached the officer, the officer got out of his vehicle and asked the defendant if he had any personal identification. The defendant handed the officer an identification card, which the officer used to radio the police dispatch to check for outstanding warrants. Before the officer received any information back from his dispatcher and after he had returned the identification card to the defendant, the officer asked the defendant for consent to search, and the defendant responded, "no, go ahead."

On those facts, the *Hall* court held that the officer's gesture to the defendant to approach the officer's patrol car

did not intrude on the defendant's liberty of movement, even though the gesture changed his direction of travel and inconvenienced him. The court explained that "[the officer's] actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' " 339 Or at 19. In other words, gesturing to a person to approach so that a conversation could occur is the kind of social conduct that occurs ordinarily in encounters in our society. Indeed, the *Hall* court specifically recognized the principle in *Holmes* that "the pivotal consideration is whether 'the officer, even if making inquiries a private citizen would not, has otherwise conducted [himself or herself] in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens.' *Holmes*, 311 Or at 410." *Hall*, 339 Or at 18. It follows from a proper understanding of the *Hall* opinion that, had there existed nothing more than a conversation between the defendant and the police followed by a request by the police to search the defendant, the motion to suppress would have been properly denied because the officers had not exercised their authority as officers or sought consent to search through coercive means.

When, however, the officer in *Hall* took the defendant's identification card and the defendant became cognizant that the officer was investigating whether there were outstanding warrants for his arrest, the consensual nature of the encounter dissipated and the encounter evolved from a "'mere conversation' encounter into a restraint upon [the] defendant's liberty of movement." *Id.* at 19. It is the evolution from a conversation to an exercise of police authority that is missing in the circumstances in both this case and in *Fikes*. In contrast to what happened in *Hall*, Schaer's "relaxed and nonconfrontational" questions to defendant merely continued the conversation rather than causing it to evolve into a deprivation of defendant's liberty of movement in violation of Article I, section 9.

The circumstances in *Toevs* further illustrate the difference between conversation accompanied by police-initiated coercion and what occurred in this case—*i.e.*, mere conversation without any element of coercion. In *Toevs*, the officer first told the defendant that he was free to go after the

officer had decided not to issue a citation for a traffic violation. However, after making that statement, the officer immediately asked the defendant if he could search the defendant's vehicle. The defendant asked the officer if the officer was accusing him of anything, and the officer responded that he was not accusing the defendant of having committed any criminal offense but wondered why the defendant would not consent to a search if he was not hiding anything. The officer then repeated his request for consent to search both the defendant and the defendant's vehicle and also inquired if there were any drugs in the defendant's vehicle. To those statements, the defendant responded that he did not have any drugs, and he refused to consent to a search.

At that point in time, another officer approached the defendant and interrupted the conversation that had been occurring. That officer asked the defendant in a "low key" and "friendly" manner "if he had any dope in the vehicle." The defendant answered, "no." However, based on the defendant's appearance and demeanor, the officer believed that the defendant might have ingested methamphetamine. That officer then told the defendant that he would feel better if he was honest with the officers and if he admitted that he had drugs in the car, if indeed that was the case. The second officer then asked again if the defendant had any drugs in the vehicle, and the defendant responded, "there is a little in the truck." In essence, the officers' continued detention of the defendant in *Toevs* overcame his initial refusal to consent to a search. *See also State v. Ehret*, 184 Or App 1, 55 P3d 512 (2002) (holding that a continued unlawful detention after a lawful traffic stop resulting in a consent to search was an exploitation of a prior illegality in violation of Article I, section 9).

On those facts, the Supreme Court ruled that a reasonable person in the defendant's position could have believed that the officers had significantly restrained his liberty or freedom of movement. *Toevs*, 327 Or at 536. In particular, the court observed that, "[w]hen it became apparent that [the first officer] was unable to obtain defendant's consent to a search, [the second officer] also approached defendant and interrupted [the first officer]. [The second officer] then asked defendant two more times if he had any drugs in

the vehicle." *Id.* The court concluded, "Indeed, the officers' continuous show of police authority constituted conduct that was 'significantly beyond that accepted in ordinary social intercourse, * * * [and that] through that conduct, they continued to detain defendant.' " 327 Or at 536-37.

The circumstances in this case are in stark contrast to the circumstances in *Toevs.* After her identification was returned to her, defendant was left alone while both officers escorted her husband to the patrol car some distance away. There is no evidence that she was told by the police to remain at the location where she was seated. Unlike what occurred in *Toevs,* there were no multiple requests by Schaer for consent to search or circumstances where defendant initially refused the request to search followed by subsequent efforts by the police to overcome her will; rather, defendant responded to the sole request by Schaer to search her purse by responding, "yeah, sure."

In summary, the encounter that occurred between defendant and Schaer after the officers returned to defendant's location consisted merely of a conversation unaccompanied by any coercive verbal or physical conduct on the part of the officers. Applying a *Holmes* type (a) analysis, I would hold that Schaer's questions did not effect a seizure of defendant's person for the reasons discussed above. Accordingly, I dissent from the lead opinion's holding.

Sercombe, J., joins in this dissent.