Submitted May 28, 2008, vacated and remanded for further proceedings
July 1, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JUAN JOSE ZAMORA-MARTINEZ,
*Defendant-Appellant.*

Washington County Circuit Court
C051006CR; A129382

211 P3d 349

Peter Gartlan, Chief Defender, and Stephanie Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Michael R. Washington, Senior Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

Following a stipulated facts trial, defendant was convicted of two counts of criminal possession of a forged instrument in the first degree. ORS 165.022. He appeals, assigning error to the trial court's denial of his motion to suppress evidence—specifically, two forged documents—that he contends were the product of an illegal stop. We vacate and remand for further proceedings.

We review a trial court's ruling regarding the suppression of evidence for legal error and are bound by that court's findings of historical fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The trial court adopted the testimony of U. S. Immigration and Customs Enforcement (ICE) Senior Special Agent Billison as its findings of fact.

Billison accompanied Hillsboro narcotics officers as they executed a search warrant at defendant's sister's residence. Although execution of the warrant was undertaken primarily by the narcotics officers, Billison was present to deal with any immigration-related issues. Forged immigration and Social Security documents were discovered during the search and, as a result, Billison detained some of the persons in the residence for immigration violations. Hillsboro police arrested others on drug charges. Ultimately, all of the adults at the residence were taken into custody.

Because there were several minors at the residence who would have been left without adult supervision, Billison telephoned their mother—defendant's sister—and asked her to return to the residence to care for her daughters. Defendant arrived at the residence 10 to 15 minutes later, and Billison testified that it appeared as though defendant's arrival was related to Billison's telephone call.

When defendant arrived, he was approached by the Hillsboro officers, who asked why he was present. After learning that defendant was there to take custody of the children, the officers called Billison, who had been inside the residence, to defendant's location. Billison, who was in plain

clothes but wearing a badge, introduced himself to defendant, identified himself as an ICE agent, and asked to see defendant's identification. Defendant produced an Oregon identification card. Billison looked at the card and then asked defendant where he was from. After defendant responded, "Mexico," Billison asked whether defendant had any other identification. Defendant responded affirmatively and produced a resident alien card and a Social Security card, both of which Billison immediately recognized as forgeries. Billison later testified that, had defendant chosen to walk away at any point before he produced the forged documents, he "suppose[d]" that he would have allowed defendant to do so.[1] The entire encounter lasted "less than two minutes."

Defendant was arrested and charged with two counts of first-degree criminal possession of a forged instrument. Before trial, defendant moved to suppress evidence of the forged instruments. The trial court denied defendant's motion, reasoning that defendant's interaction with Billison was a "mere street encounter," that Billison's request to see identification was not a stop of defendant, and that defendant's production of the fraudulent identification provided probable cause to arrest him.[2] As noted, defendant agreed to a stipulated facts trial and was convicted.

■   On appeal, defendant does not challenge the propriety of the officers' actions in approaching him and asking why he was present. Nor does defendant challenge Billison's initial request for identification. Rather, he contends that Billison's inquiry regarding *additional* identification escalated the encounter into a stop and that the stop was unsupported by reasonable suspicion, in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[3] Defendant argues

---

[1] Defendant also testified at the suppression hearing. Defendant's recollection of the circumstances surrounding his interaction with Billison differed significantly from the version found by the trial court. Although the trial court rejected defendant's version of events, defendant did testify that, as a result of the encounter, he did not believe that he was free to leave.

[2] The trial court ruled on defendant's motion to suppress shortly before the Supreme Court decided *State v. Hall*, 339 Or 7, 115 P3d 908 (2005).

[3] Although defendant contends that Billison's actions violated the Fourth Amendment and summarily discusses Fourth Amendment law, he does not explain why Billison's conduct violated the Fourth Amendment. Accordingly, we decline to consider his Fourth Amendment argument. *See State v. McNeely*, 330 Or 457, 468,

that the request for additional identification conveyed that Billison was not satisfied with the initial offer of identification and that, given the presence of other police officers, that inquiry was sufficient to cause a reasonable person to believe that he or she was not free to leave.

The state responds that Billison's request for additional identification was not a temporary restraint on defendant's liberty for investigatory purposes or otherwise and that, therefore, defendant was not stopped for the purposes of Article I, section 9. In any event, the state contends, because defendant had arrived to take custody of the children at the premises, it was reasonable for Billison to verify defendant's identity before releasing the children into his care.

■■ Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search, or seizure[.]" For the purposes of Article I, section 9, a stop occurs when a law enforcement officer intentionally and significantly restricts an individual's liberty or freedom of movement, or when the individual believes that such a restriction has occurred and that belief is reasonable under the circumstances. *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). In determining whether a police officer has seized a person, "[t]he pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Id.* at 410 (citation omitted).

■ As noted, defendant argues that Billison turned an otherwise consensual encounter into a stop when he asked whether defendant had additional identification. A consensual police-citizen encounter can become a stop if the encounter causes a person reasonably to believe that he is the subject of a criminal investigation and, for that reason, his liberty of movement has been significantly restricted. *State v. Hall*, 339 Or 7, 18-19, 115 P3d 908 (2005). In *Hall*, the court held that an officer turned an otherwise consensual encounter into a stop when the officer requested the defendant's identification and then used that identification to conduct a

8 P3d 212, *cert den*, 531 US 1055 (2000) (declining to address an undeveloped claim of constitutional error).

warrant check. *Id.* at 19. More recently, this court held, in *State v. Highley*, 219 Or App 100, 108, 180 P3d 1230 (2008), that the defendant, who was a passenger in a car that had been the subject of a traffic stop, was himself stopped when an officer inquired about his probationary status and, afterwards, wrote down the defendant's identifying information and walked to the police car. We reasoned that, under those circumstances, a reasonable person would feel that the officer had taken those actions in order to conduct a records check.

*State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009), is also instructive. In that case, the defendant and her husband, a "middle-aged" couple, were in a park more typically frequented by children and the elderly. *Id.* at 18. Suspicious, two bicycle police officers approached the couple and asked for identification. A records check revealed that the defendant had a valid restraining order against her husband and, as a result, the officers arrested the defendant's husband and requested that a patrol car be called to transport him. During the investigation and arrest, the defendant's conversation with the officers was "relaxed and nonconfrontational," and she knew that she was not being detained. *Id.* at 19. Eighteen minutes after the encounter began, the defendant's husband was finally transported away, and the officers approached the defendant, who was still present at the scene. One of the officers then asked the defendant if she had "anything illegal" in her purse. *Id.* After the defendant told the officer that she did not, he asked for, and received, her consent to look inside her purse, where he discovered methamphetamine. That conversation also was "relaxed and nonconfrontational." *Id.*

We concluded that, under those circumstances, a person in the defendant's position could have felt that she was not free to refuse the officer's request and leave:

> "Although [the defendant's] conversation with the two officers was 'relaxed and nonconfrontational,' it was a conversation between one citizen and two uniformed, armed police officers who had, within the previous 20 minutes, required her to produce identification; had, as she watched, arrested her husband, handcuffed him, and put him in a patrol car for transportation to jail; had approached her again and asked if she was carrying contraband; and obviously not

believing her denial, had asked to search her purse. If, in those circumstances, she believed that she could not refuse the request and leave, that belief was a far cry from unreasonable."

*Id.* at 25. Although we acknowledged that, historically, our cases had dealt specifically with warrant checks, we observed that the underlying principle in those cases is that "a person who knows that he or she is being investigated by a police officer during an encounter could reasonably believe that, for that reason, his or her freedom of movement has been restrained." *Id.* at 28. Accordingly, we emphasized that there was "no meaningful distinction between situations in which awareness of the investigation derives from a warrant check * * * and those in which the awareness derives from a request to search following a defendant's denial of wrong-doing." *Id.*

With those principles in mind, we return to the facts of this case. On this record, we conclude that a reasonable person in defendant's position could have believed that he was not free to leave. Although we agree with the state's contention that a reasonable person seeking to take custody of children would expect to be asked for identification, we nevertheless agree with defendant's argument that, on these facts, such a person could feel stopped after being asked for additional identification. When defendant informed the Hillsboro officers why he was present on the scene, the officers did not produce defendant's nieces, but instead called a federal immigration officer to the scene. Even if Billison's goal was to ascertain defendant's identity before releasing the minors into defendant's care, the encounter changed after Billison's initial request for identification. In response to that initial request, defendant presented an Oregon identification card that, as far as the record reveals, was a satisfactory form of identification. Despite having established defendant's identity, Billison did not place defendant's nieces in his care, but instead asked defendant where he was from. After learning that defendant was from Mexico, Billison inquired about additional identification. At that point, defendant, who knew Billison to be a federal immigration agent to whom he had already provided identification, could reasonably have believed, despite the brevity of the encounter, that Billison's

purpose was not to ascertain defendant's identity before releasing his nieces into his care, but to investigate whether defendant was lawfully residing in the United States.

*State v. Cohan*, 227 Or App 63, 204 P3d 816 (2009), does not require a different conclusion. There, we held that the defendant, whom a police officer had seen driving, was not stopped when the officer asked to see his identification. We noted that, before the defendant produced an Oregon identification card (rather than a driver license), the officer was not investigating a crime, and the defendant had been told repeatedly that he was not in trouble and was not under arrest. We concluded that, under those circumstances, a reasonable person would have felt that he or she was free to leave. *Id.* at 65-66, 72.

Here, Billison never informed defendant that he was not in trouble and that he was not under arrest. Moreover, as we concluded above, under these circumstances, a reasonable person could have concluded that, after his initial request for identification, Billison's inquiries were investigatory and were intended to determine whether defendant was lawfully in the United States and that, as a result, defendant was not free to leave. If defendant in fact held that belief, it was reasonable.

That leaves the question of defendant's subjective belief. Here, the trial court did not determine whether defendant in fact believed that he was not free to leave, and defendant's testimony on that point was based on a view of the facts that the trial court rejected. Under these circumstances, we will remand in order to allow the trial court to make that factual determination. *Ashbaugh*, 225 Or App at 28. If the court finds that defendant did not believe that he was the subject of a criminal investigation and therefore was able to leave, the court should reinstate defendant's conviction. However, if the court determines that defendant did subjectively believe that he was unable to leave, the forged documents must be suppressed.

Vacated and remanded for further proceedings.