Submitted on remand from the Oregon Supreme Court May 11, reversed and remanded July 13, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JUAN JOSE ZAMORA-MARTINEZ,
*Defendant-Appellant.*

Washington County Circuit Court
C051006CR; A129382

260 P3d 603

Peter Gartlan, Chief Defender, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General, for respondent.

Before Brewer, Chief Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

**ORTEGA, J.**

This case is on remand from the Oregon Supreme Court, which vacated our prior decision and remanded the case for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010) (*Ashbaugh II*). Our first opinion in this case applied principles articulated in *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008), *rev'd*, 349 Or 297, 244 P3d 360 (2010) (*Ashbaugh I*), and concluded that a reasonable person could have believed, under the circumstances presented here, that he was not free to leave at the critical point in the encounter with law enforcement at issue. Accordingly, we vacated the trial court's denial of defendant's motion to suppress evidence and remanded the case for the trial court to determine whether, during defendant's encounter with law enforcement, defendant subjectively believed that he was not free to leave. After our decision, the Supreme Court issued its opinion in *Ashbaugh II*, reversing *Ashbaugh I*. We are now called upon to examine whether, under the standard set forth in *Ashbaugh II*, defendant's encounter with law enforcement amounted to an illegal stop under Article I, section 9, of the Oregon Constitution.

We take the facts and pertinent procedural history from our earlier opinion:

"[U.S. Immigration and Customs Enforcement (ICE) Senior Special Agent Billison] accompanied Hillsboro narcotics officers as they executed a search warrant at defendant's sister's residence. Although execution of the warrant was undertaken primarily by the narcotics officers, Billison was present to deal with any immigration-related issues. Forged immigration and Social Security documents were discovered during the search and, as a result, Billison detained some of the persons in the residence for immigration violations. Hillsboro police arrested others on drug charges. Ultimately, all of the adults in the residence were taken into custody.

"Because there were several minors at the residence who would have been left without adult supervision, Billison telephoned their mother—defendant's sister—and asked her to return to the residence to care for her daughters. Defendant arrived at the residence 10 to 15 minutes

later, and Billison testified that it appeared as though defendant's arrival was related to Billison's telephone call.

"When defendant arrived, he was approached by the Hillsboro officers, who asked why he was present. After learning that defendant was there to take custody of the children, the officers called Billison, who had been inside the residence, to defendant's location. Billison, who was in plain clothes but wearing a badge, introduced himself to defendant, identified himself as an ICE agent, and asked to see defendant's identification. Defendant produced an Oregon identification card. Billison looked at the card and then asked defendant where he was from. After defendant responded, 'Mexico,' Billison asked whether defendant had any other identification. Defendant responded affirma-tively and produced a resident alien card and a Social Security card, both of which Billison immediately recog-nized as forgeries. Billison later testified that, had defen-dant chosen to walk away at any point before he produced the forged documents, he 'suppose[d]' that he would have allowed defendant to do so. The entire encounter lasted 'less than two minutes.'

"Defendant was arrested and charged with two counts of first-degree criminal possession of a forged instrument. Before trial, defendant moved to suppress evidence of the forged instruments. The trial court denied defendant's motion, reasoning that defendant's interaction with Billison was a 'mere street encounter,' that Billison's request to see identification was not a stop of defendant, and that defendant's production of the fraudulent identifi-cation provided probable cause to arrest him. * * * [D]efendant agreed to a stipulated facts trial and was convicted."

*State v. Zamora-Martinez*, 229 Or App 397, 399-400, 211 P3d 349 (2009), *vac'd and rem'd,* 349 Or 664 (2010) (footnotes omitted; second brackets in original).

As we explained in our original opinion, the only issue on appeal is whether "Billison's inquiry regarding *addi-tional* identification escalated the encounter into a stop and * * * the stop was unsupported by reasonable suspicion, in violation of Article I, section 9[.]" 229 Or App at 400 (empha-sis in original). Defendant asserted that, in seeking addi-tional identification, the officer indicated that he was "not

satisfied with the initial offer of identification and * * *, given the presence of other officers, that inquiry was sufficient to cause a reasonable person to believe that he or she was not free to leave." *Id.* at 401. The state, on the other hand, argued that defendant was not stopped because the request for additional information "was not a temporary restraint on defendant's liberty for investigatory purposes or otherwise[.]" *Id.*

We analyzed that issue by reference to our decision in *Ashbaugh I*, in which we concluded that a seizure occurs when a reasonable person under the circumstances "*could have believed*" that he or she was not free to leave. 225 Or App at 25 (emphasis in original; quotation marks omitted). Using that construct, we concluded that, under the circumstances presented in this case, "a reasonable person *could* have concluded that, after his initial request for identification, Billison's inquiries were investigatory and were intended to determine whether defendant was lawfully in the United States and that, as a result, defendant was not free to leave." *Zamora-Martinez*, 229 Or App at 404 (emphasis added). In addition, as we did in *Ashbaugh I,* we remanded the case to the trial court to make a factual determination regarding whether defendant in this case "in fact believed that he was not free to leave[.]" *Zamora-Martinez*, 229 Or App at 404; *see Ashbaugh I*, 225 Or App at 28.

Subsequently, the Supreme Court's decision in *Ashbaugh II*, "abandon[ed]" the subjective component of the test for whether a seizure has occurred for purposes of Article I, section 9. 349 Or at 316. In addition, the court clarified that the proper inquiry is not whether a reasonable person *could* have believed that his liberty or freedom of movement was significantly restricted; rather,

"[a] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Id.* (emphasis in original). Thus, the question in this case reduces to whether a reasonable person, in light of the totality of the circumstances, would have believed that he or she

was not free to leave when asked by the ICE agent for additional identification.

In determining whether a reasonable person would believe that a law enforcement officer interfered with the defendant's liberty or freedom of movement, the court in *Ashbaugh II* "addressed whether the content of the officer's questions or the officer's manner or actions would reasonably be perceived as a show of authority that restricted the defendant's freedom of movement." *State v. Levias*, 242 Or App 264, 266-67, 255 P3d 611 (2011). "In earlier cases, however, the court has also held that a reasonable person would perceive a limitation on his or her freedom if the person knew that he or she was the subject of a criminal investigation." *State v. Radtke*, 242 Or App 234, 239, 255 P3d 543 (2011); *see, e.g., State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (it is "doubtful that a reasonable person * * * would think that he or she was free to leave at a time when that person was the investigatory subject of a pending warrant check and was being questioned about illegal activity"); *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) (a reasonable person would not think that he or she was free to leave when that person was the subject of a pending warrant check). Thus, as we explained in *Radtke*, "taking a person's identification for the purpose of checking on the person's status is one way in which a police officer can show authority that, in combination with other circumstances, can convey to the person whose identification has been obtained that he or she is not free to leave." 242 Or App at 239-40.

In *Radtke*, which we decided on remand from the Supreme Court for reconsideration in light of *Ashbaugh II*, we considered whether the defendant was seized for purposes of Article I, section 9, when an "officer asked for and obtained [the] defendant's name and date of birth, then wrote that information in a notebook but did not 'run' that information to determine whether there was some reason to detain her" and "immediately" began questioning the defendant about whether she was in possession of anything illegal. 242 Or App at 238-39. Under those circumstances, we concluded that a reasonable inference existed

"that [the officer] took defendant's name and date of birth for the purpose of running a check on her and the reason that he had not done so in no way indicated that he was not going to—in other words, that the investigatory process had commenced and was ongoing up to the point of arrest. That inference is bolstered by several other circumstances. First, defendant observed that the person whom she was planning to meet was under arrest, in the 'caged' back seat of the patrol car. Second, there were two officers present and both were armed and in uniform. Third, as noted, in addition to taking her information, [the officer] also questioned defendant about illegal activity, albeit in a calm and nonconfrontational voice."

*Id.* at 240. Applying the relevant legal principles, we concluded that the defendant was seized because "a reasonable person in [the] defendant's position would have believed that an investigation began when [the officer] took note of her name and date of birth; thus, she was not only being questioned about illegal activity, she was under the impression that the police had begun an investigation of her and had not given her any reason to believe that it had ended." *Id.* at 241; *see also State v. Parker*, 242 Or App 387, 394, 255 P3d 624 (2011) (where an officer "(1) asked defendant, a passenger in a stopped vehicle, if he had any warrants; (2) requested defendant's identification; (3) wrote down defendant's name and date of birth; and (4) then immediately returned to his vehicle and ran a check to determine whether defendant was the subject of any warrants[,]" applying the principles set forth in *Ashbaugh II*, a reasonable person would have concluded that he or she was not free to leave).

Likewise, applying those principles here, we conclude that, in light of all the circumstances in this case, a reasonable person in defendant's position would conclude that he or she was the subject of an investigation and was not free to leave. Specifically, defendant arrived to pick up his nieces after every adult at the residence had been either arrested on drug charges or detained for immigration violations. After defendant informed Hillsboro police officers at the scene that he was there to take custody of the children, the officers called Billison—an ICE officer who, though in plain clothes, was wearing a badge identifying himself as a federal immigration officer—to talk to defendant. Although

defendant produced an Oregon identification card in response to Billison's initial request for identification, the officer did not proceed to release defendant's nieces to him. Instead, Billison asked defendant where he was from and, upon hearing that defendant was from Mexico, asked whether he had additional identification. Furthermore, Billison did not inform defendant that he was not in trouble. A reasonable person would have concluded that Billison's questions after defendant provided his Oregon identification card were intended to determine whether defendant was legally in the United States. Thus, under all the circumstances presented here, a reasonable person would have believed that he or she was the subject of an investigation and was not free to leave. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded.