Argued and submitted February 18, affirmed May 11,
reconsideration denied July 16,
petition for review denied September 22, 1981 (291 Or 662)

# STATE OF OREGON,
### *Respondent,*
### *v.*
# TIMOTHY JAMES ARMSTRONG,
### *Appellant.*
## (No. 27066, CA 19102)
#### 628 P2d 1206

Jossi Davidson, Silverton, argued the cause and filed the brief for appellant.

James C. Rhodes, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Defendant appeals from the judgment on his conviction for Robbery in the First Degree, ORS 164.415, as an aider and abettor. He assigns as error (1) the trial court's refusal to suppress evidence seized after his arrest which occurred following a *Terry*[1] stop of the automobile he was driving, (2) the trial court's refusal to suppress evidence of an out-of-court identification, (3) the trial court's refusal to suppress certain in-custody statements made by the defendant, (4) the trial court's failure to instruct the jury that a shotgun is a deadly weapon only if loaded, and its failure to grant defendant's motion for a directed verdict on the ground that there was insufficient evidence of a threat of harm or that the weapon used was a deadly weapon, and (5) the failure of the trial court adequately to state the reasons for the sentence imposed. We affirm.

### THE FACTS

Evidence at the suppression hearing revealed that, at approximately 11:00 p.m. on March 13, 1980, an armed robbery occurred at a Plaid Pantry store located on Edgewater Street in Salem. Immediately prior to the robbery, Gordon Whitney, who was waiting to use a pay phone in the store's parking lot, noticed a car drive back and forth past the store several times. At first he observed one person in the car; later, he noticed two occupants. Whitney then saw the car parked behind the Plaid Pantry store. He observed a person get out of the car and walk into the store with a shotgun. Whitney left the area and subsequently reported what he had seen to the Salem police.

On the basis of Whitney's information, a description of a suspect vehicle was broadcast at midnight. Whitney was then shown a vehicle identification book and a second, somewhat refined description was broadcast within the hour. The car was described as possibly being a 1956 Mercury or Ford two door hardtop, two tone in color, light royal blue and white with a chrome strip, possibly having a white roof, in good condition with one headlight out on the passenger side. A description of the robber, supplied by the clerk at the Plaid Pantry store, was also broadcast. The

---

[1] *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

suspect was described as a white male, 19 to 20 years of age, five feet 10 to five feet 11 inches in height, having dark wavy hair about ear length and wearing a Levi jacket and blue trousers.

Officer Kurtz, who was on patrol that morning, heard the broadcast. Kurtz testified that he is particularly familiar with Ford products of the 1955-56 vintage. At approximately 3:55 a.m., while parked about five miles from the scene of the robbery, Kurtz observed a 1955 or 1956 Ford which appeared to be two-tone in color. Kurtz pursued the car. Before he could overtake it to get a better view, the car made a broad sweeping turn into a parking lot and then proceeded in the direction from which it had just come. Kurtz testified that the car appeared to accelerate more than would normally be expected when coming out of the turn. As he drove closer to the car, Kurtz noted that it had one occupant, appeared to be white with a blue bottom and was a four door sedan. He noticed further that the headlights were on high beam. After the car turned around, Kurtz activated the overhead lights of his patrol car and pulled into its path. He testified that he stopped the car because it matched the description of the vehicle involved in the robbery of the Plaid Pantry store.[2]

The defendant was driving the car. Once it was stopped, Officer Kurtz switched on his spotlight and got out of his own car. He testified that at this point he and the defendant were face to face, and he could see that the defendant matched the description of the suspect involved in the Plaid Pantry robbery. Kurtz approached the defendant and ordered him out of the car. He searched the defendant but found nothing. Kurtz then advised the defendant of his *Miranda* rights by reading them from a prepared card. The defendant signed the card indicating that he understood his rights. Before Kurtz had a chance to question the defendant, another officer, Blaylock, arrived, and the defendant was taken to Blaylock's patrol car. With the aid of a flashlight Kurtz then looked into the defendant's car. He noticed cigarette cartons, beer bottles, a tan jacket,

---

[2] The driver failed to signal when he made the left turn into the parking lot. The officer testified that he did not stop the car because of the traffic infraction and the state does not rely on the traffic violation as a basis for the stop.

shotgun shells and what appeared to be the receiver portion of a shotgun. Kurtz then called Blaylock over to show him what he had found. The car was secured and a warrant to search the vehicle was later obtained.

After examining the defendant's car, Blaylock returned to his patrol car to speak with the defendant. Initially he asked the defendant if he understood his rights as read to him by Kurtz and if he knew that he was entitled to an attorney before answering any questions. The defendant indicated that he did understand. Blaylock then questioned the defendant about his activities the prior evening and specifically asked him about the gun. The defendant indicated that he had been with a friend all evening and was on his way home. He stated that he had used the shotgun to shoot skeet the week before. When asked about the robbery, the defendant hesitated and then denied any involvement in it.

While the defendant was being questioned, the clerk from the Plaid Pantry store was brought to the scene to see if he could identify the defendant.[3] Concerning the on-the-street identification, the clerk stated that he was awakened at 3:30 or 4:00 a.m. and told by a police officer that they had someone they wanted him to look at. He asked if the person was a suspect in the robbery. The police officer again indicated that they had stopped someone they would like him to look at. Arriving at the scene, the clerk saw the defendant standing in front of a police car with an officer next to him shining a large flashlight in his face. Three other police cars were there; all had their lights flashing. The patrol car in which the clerk was riding pulled up to a place near the defendant and, with its headlights shining on him, stopped about ten to fifteen feet away. Within a matter of seconds the clerk identified the defendant as the robber and then crouched down in the seat because he was afraid that the defendant would see him. The clerk indicated at the suppression hearing that, when

---

[3] The clerk testified that the robber wore a mask during the course of the robbery. However, once the robber was outside the store, his mask slipped off as he stopped to pick up packs of cigarettes that he had dropped. It was then that the clerk, who had gone to the door, saw the robber's face. The clerk indicated that the lighting in front of the store was bright and that the robber was directly facing him for about five seconds.

he saw the defendant, he was 95 percent sure that he was the same person who had robbed the store.

## STOP OF THE CAR

We first consider the stop of the defendant's car. An officer who reasonably suspects that a person has committed a crime may stop that person and make a reasonable inquiry. ORS 131.615. ORS 131.605(4) defines "reasonably suspects:"

"(4) 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

In determining whether a stop is justified, we look to see whether the facts perceived by the officer constituted objective cause for the stop. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *State v. Ponce,* 43 Or App 665, 668, 603 P2d 1243 (1979); *State v. Robertson,* 42 Or App 471, 476, 600 P2d 935 (1976). Where, as here, the officer knows that a serious crime has been committed and immediate action is necessary to apprehend the offender, "then factors which would be of marginal significance in a general investigation take on heightened importance." *State v. Denny,* 27 Or App 455, 458, 556 P2d 719 (1976), *rev den* 277 Or 237 (1977); *State v. Robertson, supra,* 42 Or App at 477. The question becomes whether there is a reasonable possibility that the person observed is connected with the crime the police know has been committed. *State v. Denny, supra,* 27 Or App at 459.

In *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969), the court upheld the stop of a vehicle suspected of being involved in a theft on the basis of the car's description. The car was described as a light colored 1959 four-door Cadillac. A specific license plate number was given. The car stopped was a light blue four-door Cadillac with a different license number. The court there held that the differences were not significant. The car in that case was stopped approximately one hour after the incident in question and a mile from the scene of the crime. In *State v. Robertson, supra,* this court upheld the stop of a vehicle described as an older model, white vehicle, possibly a station wagon, and suspected of being used in an armed robbery. Two black adult males

were identified as the suspects. The stop took place soon after the description was broadcast and within the general vicinity of the crime. The vehicle stopped roughly matched the description, and we noted that the two black males occupying the car behaved somewhat apprehensively upon noticing the officer's presence. *Id.,* at 477. Finally, in *State v. Bartosz,* 34 Or App 123, 578 P2d 426 (1978), we upheld a stop based on the officer's knowledge that a burglary had been committed, that a license check on a car heading out of town revealed that the car was not taking the most direct path to the owner's home and the fact that the driver took a "circuitous and apparently evasive" route after noticing the officer's presence. The stop took place 3 miles from the scene of the burglary and within one-half hour of the crime. *See also, State v. Ostrom,* 42 Or App 381, 600 P2d 910 (1979); *State v. Worthington,* 39 Or App 775, 593 P2d 1241 (1979), *rev den* 287 Or 149 (1979); *State v. Ragsdale,* 34 Or App 549, 579 P2d 286 (1978), *rev den* 283 Or 503 (1978); *State v. Denny, supra.*

In this case, the suspect car was described as a two-door 1956 Mercury or Ford, blue and white in color, possibly a white roof, and in good condition with one headlight out. The car defendant was driving was a four-door 1955 Ford, blue and white in color with a blue roof. Both headlights were operating at the time but they were on high beam. The differences are minimal. Kurtz, who testified to familiarity with Ford cars of this vintage, indicated that the basic outline of the 1955 and 1956 Ford are the same. The fact that the headlights were on high beam would tend to indicate that one of the regular beams may have been inoperable. The car itself is a "classic" type not commonly seen. Kurtz testified that while on routine patrol he normally sees only two or three like it in a month.

■    Kurtz knew that a robbery had been committed. He knew what type of car was involved in the robbery. The car stopped basically fitted the description given, it was stopped during the early hours of the morning when few cars are likely to be out, the stop took place five hours after the robbery and within the city of Salem. Finally, after Kurtz began to trail the defendant, he turned around and began to proceed rapidly in the other direction—an evasive act.

Given these facts, we conclude that the officer had an objective reason for believing that the car and the person driving it were connected with the alleged robbery.

The scope of the inquiry permitted after a stop is limited. *State v. Wight,* 48 Or App 731, 617 P2d 928 (1980). However, in this case, it is undisputed that the defendant was taken into custody immediately after the stop.[4] We believe that probable cause for arrest existed once the officer found that the defendant matched the description of the robbery suspect. It is true, as defendant points out, that the description of the suspect which had been given was relatively general. However, the factual basis for the stop, as related above, plus the fact that the defendant fit the description of the robbery suspect, provided an adequate basis for defendant's arrest. *See State v. Crockett,* 34 Or App 1019, 1023, 580 P2d 214 (1978); *see also, State v. Cloman, supra,* 254 Or at 471; *State v. Robertson, supra; State v. Zimmerlee,* 45 Or App 107, 607 P2d 782, *rev den* 289 Or 71 (1980).

We conclude that both the stop and subsequent arrest of the defendant were valid. Therefore, any evidence obtained as a result of the stop and arrest was admissible at trial.

## IDENTIFICATION

Defendant's second contention is that his out of court identification was conducted under suggestive circumstances and should have been suppressed.

The facts concerning the out-of-court identification have been recited, *supra.* We do not reach the merits of this contention because of a procedural peculiarity in this case. In addition to the general verdict forms which juries in criminal cases normally receive, the jury in this case was given a special interrogatory. The jury found, in response to that interrogatory, that this defendant did not personally enter the Plaid Pantry store.[5] It follows that the identification of defendant as the robber who entered the store

---

[4] The defendant was not formally arrested by Officer Kurtz. However, the trial court found (and the state does not contend otherwise) that he was taken into custody·at that time.

[5] At trial the defendant testified that he had driven to the store with a friend and that it was his friend who entered and robbed the store. Apparently, the jury believed the defendant and concluded that the clerk was mistaken in his identification of the defendant. We should not be understood by this opinion to approve the use of special interrogatories in criminal cases.

was disbelieved by the jury and was, therefore, harmless beyond a reasonable doubt.

## DEFENDANT'S STATEMENTS

■     Defendant's next assignment of error challenges the trial court's failure to suppress testimony of the statements made by him to Officer Blaylock. These statements were made after defendant was informed of his *Miranda* rights. There is no evidence that he did not understand those rights. There is some dispute in the record as to when the defendant first requested to speak with an attorney. Blaylock testified that the defendant did not ask for an attorney until after he had been identified by the Plaid Pantry clerk. The defendant's testimony indicates that he asked to speak with an attorney while sitting in the patrol car but after Blaylock questioned him about his whereabouts the prior evening and about the shotgun. The defendant stated that the officer continued to question him after he made his request. The trial court found that the defendant's statements were made after he was informed of his *Miranda* rights and freely waived those rights. He made no specific finding concerning the request for an attorney. Given the court's finding that the statements were admissible, we presume that the trial judge believed Blaylock's testimony and not the defendant's. Where, as here, there is sufficient evidence to support the trial court's finding, we are bound by that finding. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

## SUFFICIENCY OF EVIDENCE

Defendant also contends that there was insufficient proof to support his conviction for First Degree Robbery. He claims that there is no direct evidence of a threat of force or that the shotgun used in the robbery was loaded.[6] Additionally, he contends that the trial court should have instructed the jury as follows: "A shotgun is a deadly weapon if it is loaded." We disagree.

---

[6] ORS 164.415(1) provides:

"(1) A person commits the crime of robbery in the first degree if he violates ORS 164.395 and he:

"(a) Is armed with a deadly weapon; or

"(b) Uses or attempts to use a dangerous weapon; or

The robber entered the store with a shotgun. Before he could say anything the clerk offered to get the money for him. The robber then ordered a customer in the store to get him some beer. According to the clerk, the robber generally pointed the shotgun toward the ground, at about a 45 degree angle. However, as he ordered the customer to get the beer, he motioned with the gun. Defendant's brief concedes that, as the robber was gesturing, the clerk's body was in the line of fire for at least a fleeting moment. No vocal threats were made by the robber during the course of the robbery.

When the shotgun was found by the police, it was unloaded. A box of shotgun shells were also found in the car and introduced into evidence. Before the gun was tested by the police, an officer cleaned out dirt which had become lodged in the barrel. The officer testifying did not indicate whether the gun was inoperable in the condition it was found. The only evidence that the gun was unloaded at the time of the robbery and was not safe to operate came from the defendant.

■■ The evidence supports defendant's conviction. There is sufficient proof from which the jury could find that a threat was made and that the defendant was armed with a deadly weapon. As the defendant himself admits, the gun was pointed at the clerk for at least a moment. Where a person points a gun at another within firing range in the course of a robbery, the jury may infer that the gun was loaded. *State v. Vance,* 285 Or 383, 389, 591 P2d 355 (1979); *State v. O'Keefe,* 40 Or App 685, 695-696, 596 P2d 987, *rev den* 288 Or 81 (1979). Such behavior would also support a finding that a threat of force was made.

---

"(c) Causes or attempts to cause serious physical injury to any person."

ORS 164.395(1) provides:

"(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft he uses or threatens the immediate use of physical force upon another person with the intent of:

"(a) Preventing or overcoming resistance to his taking of the property or his retention thereof immediately after the taking; or

"(b) Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft."

## INSTRUCTION

■ We conclude further that the jury was properly instructed. The court instructed the jury that a deadly weapon is an instrument specifically designed for and presently capable of causing death or serious physical injury. The phrase "presently capable of causing death or serious physical injury" is in substance the same as saying that a shotgun is deadly if loaded. The jury had to infer that the gun was loaded before they could find that it was "presently capable" of causing the proscribed harm.

## SENTENCING

■ The defendant's last assignment of error is that the trial court erred in failing to state the reasons for the sentence imposed. We disagree. The trial judge's explanation, while not a model, was sufficient.

Affirmed.