Argued and submitted March 11, 2009, Clackamas High School, Clackamas,
reversed and remanded July 22, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

VINH BA NGUYEN,
*Defendant-Appellant.*

Multnomah County Circuit Court
070444863; A136914

212 P3d 1284

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Norby, Judge pro tempore.

EDMONDS, P. J.

Norby, J. pro tempore, dissenting.

**EDMONDS, P. J.**

Defendant appeals a judgment of conviction for carrying a concealed weapon, ORS 166.240(1), and assigns error to the denial of his motion to suppress the evidence of the weapon. He contends that the seizure of the weapon was the product of an unlawful deprivation of his liberty of movement under Article I, section 9, of the Oregon Constitution. We agree with defendant's argument and reverse and remand.

City of Portland Police Officer McCollister testified for the state at the hearing on the motion to suppress. McCollister was aware that the parking lot in Lents Park closed to the public at 10:00 p.m. When he arrived at the park at 11:45 p.m., on routine patrol, he observed several cars parked in the parking lot and "five or six people milling about in the parking lot and on the sidewalk."[1] He believed that the group had been drinking alcoholic beverages. McCollister explained, "I approached the group. They were kind of milling about and I could see several beer bottles, beer cans kind of strewn just inside the park." According to the officer, the beer bottles or cans were "roughly" 10 feet from the group. McCollister testified that he formed the subjective belief that the bottles or cans belonged to the group of people that he had observed upon arriving because "there's a tree just off the parking lot in there, where several that had walked behind the tree and the—the beer cans, beer bottles were basically situated next to the tree." McCollister then asked the members of the group whether the cars in the parking lot belonged to them, and "several people said that they were their vehicles." At that point, two other police cars arrived on the scene with their overhead lights on. One of the arriving officers informed McCollister that some of the people in the group had been present at the scene of a recent shooting in the area.[2]

---

[1] There is no evidence in the record from which it can be inferred that defendant was one of the drivers who had parked in the parking lot after the park had closed. Consequently, we disagree with the state's alternative argument that McCollister had probable cause to detain defendant for purposes of citing him for illegal parking.

[2] There is no indication in the record that defendant was among the persons who were present at the shooting.

McCollister had everyone in the group sit on the ground. McCollister testified, "At that point, then I—I started asking some of the people if they had any weapons on them[.]" One of those persons was defendant, who, according to McCollister, responded, "Go ahead." While conducting a search of defendant's person, the officer seized a pair of brass knuckles from one of his pockets.

At the hearing on the motion to suppress, defendant contended that McCollister lacked reasonable suspicion to believe that the group was involved in criminal activity when the police cars arrived with their lights on and he had the group sit on the ground. However, the trial court ruled, "I'm going to find that there was reasonable suspicion, and so I'm denying the motion." The court explained,

> "In our case, it was 11:45 at night on March 17, 2007. The parking lot of the public park was closed to the public. The officer observed several cars parked in the parking lot and has noted from past experience that there are signs posted indicating that individuals are not allowed to park there after 10:00 o'clock. * * *

> "[O]n this particular evening, the officer approached a group of individuals, including [defendant], who were milling about near the vehicles. He saw several beer cans that he indicated were approximately 10 feet from the group and believed that those cans were associated with the individuals in the group. I do agree that he did not articulate anything specifically directed to [defendant], but I believe, under the circumstances of a case like this, where an officer has a group and believes that individuals in the group are connected with a particular crime, that he—a reasonable suspicion has occurred, that he is authorized to approach the group as a whole and question individuals, as part of his investigation."

Under Article I, section 9, of the Oregon Constitution, an officer must have a reasonable suspicion of criminal activity before the officer can lawfully interfere with an individual's freedom of movement, even on a temporary basis. *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991). In this case, McCollister detained defendant because he believed that defendant was in violation of the Portland City Code's prohibition against drinking in public. Accordingly,

McCollister's actions were subject to the constraints imposed by Article I, section 9. The analysis of a defendant's rights under Article I, section 9, is substantially the same as the analysis of a defendant's statutory rights under ORS 131.605 to 131.625. *State v. Kennedy*, 290 Or 493, 497, 624 P2d 99 (1981). For purposes of the Oregon Criminal Code, a "reasonable suspicion" is defined as a "belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts" to deprive a person of his or her liberty. ORS 131.605(5). Moreover, "if a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has 'reasonable suspicion' and hence may stop the person for investigation." *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993).

 With the above principles in mind, we turn to the provisions of the Portland City Code, the circumstances of this case, and the reasoning of the trial court and the dissent. Section 14A.50.010(B) of the Portland City Code provides, in part,

> "It is unlawful for any person to have in his possession while upon any street, sidewalk, or other public right-of-way any bottle, can, or other receptacle containing any alcoholic liquor which has been opened or a seal broken or the contents of which have been partially removed."

The word "possess," as used in section 14A.50.010(B), is expressly defined by the Portland City Code as "to have physical possession or otherwise to exercise dominion or control over property." PCC 14A.10.010(N). Additionally, "possess" is a word of legal art commonly used in statutes or ordinances prohibiting the possession of alcoholic beverages in different contexts. *See, e.g.*, ORS 811.170(1)(b) (making it unlawful for a person to possess an open container of alcoholic liquor while in a motor vehicle on a public highway).

The word "possess" is also defined for purposes of the Oregon Criminal Code in ORS 161.015(9). That statute provides that the word "possess" means "to have physical possession or otherwise to exercise dominion or control over property." The statute uses language identical to the language in the Portland City Code and codifies the concepts of actual

and constructive possession. The rule of "constructive possession" broadens the crime of possession beyond actual physical control to situations in which actual physical control cannot be directly proved but there is an available inference that the person exercised dominion or control over the object. *State v. Casey*, 346 Or 54, 59, 203 P3d 202 (2009); *see also State v. Fries*, 344 Or 541, 185 P3d 453 (2008) (holding that where the defendant transported marijuana plants at the direction of a friend, he "possessed" them for purposes of ORS 475.840(3)).

Additionally, the word "possess" has been interpreted by the Supreme Court with respect to related state statutes. In *State v. Williams*, 117 Or 238, 243 P 563 (1926), the defendant was indicted for unlawfully possessing intoxicating liquor. The parties stipulated that, at the invitation of a friend who was the owner and possessor of a bottle of intoxicating liquor, the defendant took a drink from the bottle and immediately returned it to his friend. The court held that there were no facts or circumstances "from which the jury could have drawn a reasonable inference that defendant was exercising some control, dominion or ownership over the intoxicating liquor." 117 Or at 243. In *State v. Gordineer*, 229 Or 105, 111, 366 P2d 161 (1961), the court explained that "possession" as used in former ORS 471.430 includes, in addition to guilty knowledge, "the intent * * * to possess full control over the liquor with the right to enjoy its consumption to the exclusion of others."

The above definitions support the conclusion that the Portland City Council intended the word "possession" in PCC 14A.50.010(B) to refer to the legal concepts of actual and constructive possession. With those concepts in mind, we turn to the circumstances of this case to inquire whether McCollister's suspicion that the ordinance had been violated by defendant's possession of an open container of alcohol was objectively reasonable. McCollister based his suspicion that the ordinance had been violated on his observation that the group of which defendant was a part was about 10 feet away from "several beer bottles, beer cans kind of strewn just inside the park." The beer containers "were basically situated next to the tree," an area from which "several [people] * * * had walked."

It is clear from the officer's testimony that he did not observe defendant in actual possession of any of the beer cans strewn around the tree; rather, defendant was 10 feet away from the area in which the containers were scattered. Moreover, there is no evidence that the officer smelled the odor of an alcoholic beverage on the breath of defendant or on the breath of any other member of the group. Also, no member of the group was observed in the physical possession of an open container of an alcoholic beverage before the group was detained. Indeed, the members of the group were deprived of their freedom of movement by McCollister's actions immediately on his arrival at the park. At that point in time, he told the group that they could not leave and required each member of the group to sit on the ground. Under the circumstances, we conclude that McCollister did not articulate any circumstances that furnished a reasonable suspicion that defendant was in actual possession of an open container of an alcoholic beverage.

Next, we turn to the issue of constructive possession. Again, our review of the record indicates that McCollister did not testify to any circumstances from which it can be reasonably inferred that any member of the group, much less defendant, exercised dominion or control over the containers so as to constitute constructive possession of them. The group was merely in the vicinity of the containers in a public area next to a parking lot where the containers could have been placed by any member of the public. In other words, there is no evidence that the containers were in a secluded location, circumstances that could give rise to an inference that they were brought to that location in order to be consumed without scrutiny. Finally, there is no evidence as to whether the beer containers observed by the officer were empty or full, or whether they appeared to be brand new or old, facts from which it might be inferred how long the containers had been lying next to the tree.

In *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), the court held that an otherwise voluntary consent to a police officer's request to conduct a search of a person is vitiated when the officer trades on a prior illegality such as unconstitutional restraint of the person's freedom of movement in

order to obtain the consent. That principle directs us to the result in this case. In the absence of an objectively reasonable suspicion that defendant had actual or constructive possession of an open container of alcoholic beverage, the officer lacked authority under Article I, section 9, to require him to sit on the ground. That illegal exercise of authority by the officer over defendant resulted in defendant's consent to search without any other intervening event. It follows that the trial court erred by denying defendant's motion to suppress the evidence seized from his pocket.

The dissent disagrees; in its view, the above analysis creates "an overly restrictive threshold for reasonable suspicion in this case." 229 Or App at 727 (Norby, J. pro tempore, dissenting). Significantly, the dissent does not point to any circumstances other than those recited above. In the dissent's view, "the historical facts establish that the 18-year-old defendant was socializing with four or five friends on St. Patrick's Day near midnight in a public park in Portland. There were several beer bottles and beer cans on the ground near them." 229 Or App at 728 (Norby, J. pro tempore, dissenting). But there is nothing criminally suspicious, insofar as PCC 14A.50.010(B) is concerned, about four or five young people socializing near midnight in a public place. Otherwise, police could constitutionally detain young people because of their mere association with each other. Moreover, whether individualized suspicion of unlawful activity arises from the activity of a group depends on the circumstances themselves, which will be different in every case. *See, e.g., State v. Zumbrum*, 221 Or App 362, 369, 189 P3d 1235 (2008) ("The mere fact that a person associates with another person involved with methamphetamine does not support a reasonable suspicion that that person is also involved with methamphetamine."); *State v. Walker*, 181 Or App 548, 47 P3d 65 (2002) (officers reasonably suspected that the defendant was committing a criminal offense when they observed him walking with two other young people, one of whom was holding a bottle that looked like a beer bottle); *State v. Manss*, 99 Or App 498, 783 P2d 24 (1989) (there was no reasonable suspicion to detain the defendant under ORS 131.615 where another person had attempted to sell drugs to three teenagers). In this case, however, we need not decide whether

there was individualized suspicion to detain defendant based on the illegal activity of a group of individuals, because there was no objectively reasonable suspicion that the group itself was involved in any illegal activity.

Reversed and remanded.

**NORBY, J. pro tempore,** dissenting.

The majority holds that, under the facts of this case, no objectively reasonable person would be suspicious that the beer containers in the park were associated with defendant and his group. Since that limited conclusion eliminates reasonable suspicion for the officer's stop, it avoids the question more pointedly posed on appeal about particularization of reasonable suspicion. The majority's analysis creates an overly restrictive threshold for reasonable suspicion in this case, which is the primary reason I respectfully dissent. Secondarily, I dissent because I believe that the test on review of the legality of a stop should be applied in a manner that accounts for a continuum of reasonable points of view, not one that attempts to convert reasonableness into a false absolute. Finally, because I would hold that the stop in this case was lawful, I reach the question most pointedly posed by the parties regarding particularization of reasonable suspicion.

## THE MAJORITY CREATES AN OVERLY RESTRICTIVE THRESHOLD FOR REASONABLE SUSPICION

The trial court made the following finding of fact:

"[The officer] saw several beer cans that he indicated were approximately 10 feet from the group and believed that those cans were associated with the individuals in the group."

That finding of fact reflects the trial court's conclusion that the officer testified credibly. The trial court continued:

"I believe under the circumstances of a case like this, where an officer has a group and believes that individuals in the group are connected with a particular crime, that he—a reasonable suspicion has occurred * * *."

Implicit in that statement is the trial court's conclusion that the officer's suspicion, linking the beer containers to defendant's group under the historical facts of this case, was objectively reasonable.

The historical facts establish that the 18-year-old defendant was socializing with four or five friends on St. Patrick's Day near midnight in a public park in Portland. There were several beer bottles and beer cans on the ground near them.

One possible explanation for defendant's circumstances is that other people, not associated with defendant's group, placed the beer containers on the ground, and defendant's group coincidentally socialized near other people's beer containers. Another possible explanation is that members of defendant's group placed the beer containers on the ground after they drank the contents.

Reasonable suspicion is a less exacting standard than probable cause. *State v. Hammonds/Deshler*, 155 Or App 622, 964 P2d 1094 (1998). That is because reasonable suspicion authorizes only the commencement of investigatory questioning.

> "[A]n officer does not need certainty or even probable cause, but only a reasonable suspicion, to support an investigation. The possibility that there may be a non-criminal explanation for the facts observed or that the officer's suspicion will turn out to be wrong does not defeat the reasonableness of the suspicion."

*State v. Kolendar*, 100 Or App 319, 323, 786 P2d 199 (1990); *see also State v. Crites*, 151 Or App 313, 316, 948 P2d 757 (1997), *rev den*, 327 Or 82 (1998) ("[P]ossible lawful explanations for behavior do[ ] not mean that it does not also give rise to reasonable suspicion of criminality.").

The fact that the beer containers in this case could have been placed on the ground by other people not associated with defendant's group does not defeat the objective reasonableness of the officer's suspicion that the beer containers were associated with defendant's group.

Moreover, "[r]easonable suspicion does not require that the articulable facts as observed by the officer *conclusively* indicate illegal activity but, rather, only that those facts support the *reasonable inference* that a person has committed a crime." *Hammonds/Deshler*, 155 Or App at 627 (emphasis in original). The majority's analysis suggests that the reasonable suspicion threshold may have been met here if the officer smelled an odor of alcohol on defendant's breath, or the breath of a member of defendant's group, or if the officer saw defendant or a member of his group holding a beer container. Those additional facts, however, would *conclusively* indicate that the crime of drinking in public had occurred. Therefore, the addition of either fact would create probable cause. Since probable cause is a higher standard than reasonable suspicion, the absence of such facts should not be dispositive in a threshold analysis for the lower standard.

Further, the majority's application of the facts to the concept of possession, control, and dominion is overly restrictive. If all circumstances articulated by the officer in this case remained the same, except that the evidence on the ground nearby was a bomb or grenade rather than beer containers, it would be objectively reasonable to become suspicious that one or more of defendant's group had been in possession of a destructive device. ORS 166.382. Similarly, if the evidence on the ground nearby was burglary tools, it would be objectively reasonable to become suspicious that one or more of defendant's group had been in possession of burglary tools. ORS 164.235. The articulated facts required to raise mere suspicion of possession should not vary depending on which item a crime proscribes.

## THE STANDARD ON REVIEW OF LEGALITY OF STOPS SHOULD HAVE A DIFFERENT EMPHASIS

The secondary reason for my dissent is that I believe that the test for review of the legality of a stop should emphasize a continuum of reasonableness, rather than pretending that reasonableness is a false absolute. This shift in emphasis would not require a change in the standard of review, but would demystify application of the cumbersome test and encourage greater consistency and predictability on review.

In *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), the Supreme Court held that a person is stopped

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

The type (a) stop in this case is properly reviewed by weighing the facts the officer testified to at the hearing to assess whether the officer's subjective belief met the standard for objective reasonableness under the totality of the circumstances. *State v. Belt*, 325 Or 6, 12, 932 P2d 1177 (1997). A type (b) inquiry similarly examines a defendant's subjective belief and evaluates its objective reasonableness. *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998).

That two-pronged test of subjective belief and objective reasonableness is well established in our jurisprudence and often applied. Nonetheless, as noted in a concurring opinion in *State v. Ashbaugh*, 225 Or App 16, 30, 200 P3d 149 (2008) (Brewer, C. J., concurring), the test "is inherently difficult to apply in a predictable and consistent way." The *Ashbaugh* concurrence isolated the core difficulty, noting that "application of the *Holmes* test * * * places a reviewing court in the position of channeling what a reasonable person * * * could (or would) believe." *Id.* Too narrowly applied, it paradoxically creates a *subjective* test of objectivity, because a conclusion that definitively identifies "objective reasonableness" can only be reached by evaluating facts in light of the intellectual and philosophical benchmarks in the evaluator's own life experience. Such benchmarks inevitably differ for each evaluator and too often dictate divergent conclusions based on the same facts, even among reasonable minds.

It is virtually impossible to eliminate all risks in application of this test. But the *Ashbaugh* concurrence suggests, and I agree, that consistency and predictability would be better served if evaluations of "objective reasonableness" did not occur within the awkward construct of a definitive absolute, but instead allowed for a continuum of reasonable

possibility. To improve the test and achieve greater consistency on review, the emphasis should be on what an actual reasonable officer, defendant, or person *could* believe, not what an imaginary reasonable person invented under a cumbersome legal construct *would* believe.[1]

If the emphasis in applying the test on review is whether a reasonable officer *could* hold the subjective belief required, it would minimize the risk that a reviewing court must inhabit an amorphous legal construct in order to generate a definitive intellectual model for a "reasonable officer." It would shift the focus to a simpler assessment of reasonableness as understood by those uninitiated into the complexities of legal fictions.

Specifically, applying the test to the historical facts of this case with the emphasis on what a reasonable officer *could* believe, we could expand the reasonableness analysis to include a slightly broader continuum of possibility. If any reasonable parent, student, or passerby uninitiated in the law saw a group of young people socializing near midnight in a public park on St. Patrick's Day with several beer containers nearby, a suspicion that the young people were associated with the beer containers would be natural. Only someone thoroughly indoctrinated in legal complexities could divest herself of such a suspicion, and then only through painstaking legal dissection of both the facts and the law. An officer should not have to resist acting on suspicions that any reasonable person would find natural. More importantly, the test for objective reasonableness used to review the legality of a stop should not superimpose a fictitious legal absolute on

---

[1] Although the term "would" has consistently been used to articulate the standard for review, the term "could" has notably been substituted in courts' conclusions based on the standard of review. In *Belt*, the Supreme Court reviewed a type (a) stop, concluding that under the totality of the circumstances, "an officer reasonably *could* hold the required subjective belief based on objective information available to him[.]" 325 Or at 13 (emphasis added). The same court had earlier articulated the test as a determination about whether the officer testified to facts sufficient "to give rise to an inference that a *reasonable* officer *would* hold the required subjective belief." *Id.* at 12 (first emphasis in original; second emphasis added).

Also, in *Toevs*, the Supreme Court reviewed a type (b) stop, concluding that under the totality of the circumstances, "a reasonable person in defendant's position *could* have believed that the officers significantly had restricted his liberty or freedom of movement." 327 Or at 536 (emphasis added).

the undeniably variable landscape of rational, good faith, human interaction.

## PARTICULARIZATION OF REASONABLE SUSPICION

Because I would affirm the trial court's conclusion that reasonable suspicion existed for the stop in this case, I would decide the more far-reaching question posed by the parties and the trial judge regarding particularization of reasonable suspicion. Defendant argued that, even if the officer had reasonable suspicion to believe someone in his group committed the crime of drinking in public, that suspicion could not authorize a stop of the entire group because that suspicion was not sufficiently particularized to any specific individual in the group. I would hold that reasonable suspicion can extend to more than one individual when the nature of the crime to be investigated and the totality of the circumstances implicate more than one person, and when there are identifiable characteristics that link the set of suspects to each other and the crime.

Oregon appellate courts have consistently held that "a person's appearance alone never can support a reasonable suspicion of unlawful activity" and "[a] police officer's suspicion must be particularized to the individual based on the individual's own conduct." *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004). However, it is reasonable for officers to draw inferences about human behavior based on their training and experience, including their training and experience regarding individuals who purposely associate with a specific, identifiable group that shares common characteristics. *Id.* at 13.

Here, the behavior of defendant and his friends, as well as the circumstances of their encounter with the officer, give rise to at least one significant inference. Based on his observations of the group's behavior and movements as they socialized in the public park on St. Patrick's Day near midnight, the officer could reasonably infer that one or more of them were associated with the beer containers on the ground nearby.

A similar inference authorized the stop of multiple individuals based on a single set of circumstances in *State v. Walker*, 181 Or App 548, 47 P3d 65 (2002). In *Walker*, this

court held that officers had reasonable suspicion to stop three apparent minors walking together, only one of whom was holding a bottle that looked like a beer bottle. In that case, the officers called out to the three minors and two walked to the police car, but one walked away behind a parked vehicle. The officers testified that they subjectively believed that the three may have been minors in possession, and this court concluded that the subjective belief was objectively reasonable for all three men. *Id.* at 551.

That result, based on the understanding that an officer has reasonable suspicion to stop more than one member of a limited and defined set of people based on shared characteristics and presence in a particular location, is unsurprising. This court has consistently held that individuals who fit a witness's description of a suspect and are in the vicinity of a recent crime may reasonably be suspected and stopped, even though each is only one of many individuals who fit that description. *See, e.g., State v. Nguyen,* 176 Or App 258, 263-64, 31 P3d 489 (2001) (stop of individual who may or may not have fit description of suspect, but who was driving suspiciously late at night near reported location of recent car prowl, was based on reasonable suspicion); *State v. Armstrong,* 52 Or App 161, 168, 628 P2d 1206 (1981) (stop and arrest of individual who fit general description of robbery suspect, and who was driving suspiciously late at night five hours after a reported robbery took place in the same city, was based on probable cause); *State v. Canape,* 46 Or App 453, 459, 611 P2d 1190 (1980) (stop of individual who closely matched the description of a burglary suspect, and who was found in same general area as recent scenes of burglaries, was based on reasonable suspicion).

Here, as in *Walker,* I would hold that it was reasonable to suspect that all of the five or six individuals who were socializing on St. Patrick's Day near midnight in the public park were associated with the beer bottles and cans on the ground near them. Therefore, I would hold that it was objectively reasonable to stop all of those individuals to investigate the suspicion that one or more of them was drinking in public. No further particularization of the officer's reasonable suspicion was required by law or the facts in this case.