Argued and submitted November 24, 2009, reversed November 24, 2010, respondent's petition for reconsideration filed December 22, 2010, and appellant's response to petition for reconsideration filed February 3 allowed by opinion April 20, 2011
See 242 Or App 264, _____ P3d _____ (2011)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## HILTON LEVIAS,
*Defendant-Appellant.*

Multnomah County Circuit Court
070532320; A138429

243 P3d 880

Kristin Carveth, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

## ORTEGA, J.

Defendant appeals a conviction, after a bench trial, of one count of unlawful possession of heroin, ORS 475.854, and one count of unlawful possession of cocaine, ORS 475.884. Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained after a consent search of his person, contending that he had been stopped without reasonable suspicion, in violation of Article I, section 9, of the Oregon Constitution,[1] and that his consent to search was tainted by the illegal detention. We agree with defendant that the trial court erred in denying the motion to suppress and reverse.

Because defendant was convicted, we summarize the pertinent facts in the light most favorable to the state. *State v. Gibson*, 338 Or 560, 562, 113 P3d 423, *cert den*, 546 US 1044 (2005) (illustrating that approach). In reviewing the trial court's denial of defendant's motion to suppress, we are bound by the trial court's findings of historical fact, as long as there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

At approximately 11:30 p.m., Officer Murphy was on patrol in a high-crime area. Murphy followed the car in which defendant was a passenger for about three blocks, until he saw the car commit a traffic infraction and activated his over-head lights. The car pulled over to the curb, and Murphy pulled in approximately 15 feet behind it.

Murphy got out of his patrol car, leaving his over-head lights activated. Defendant got out of the passenger side of the car and began walking on the sidewalk in the direction of Murphy's patrol car. When defendant was approximately halfway between the two vehicles, and while Murphy was still standing near the driver's door of his patrol car, Murphy asked defendant how his evening was going. Defendant responded, "Fine, thank you."

Murphy testified that he then asked if defendant would mind talking to him, and defendant replied, "Sure, no

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

problem." Murphy testified that his tone of voice was calm and casual and that defendant's response was polite and calm. He testified that, throughout his conversation with defendant, he believed that defendant was free to leave. Defendant testified that, when he got out of the car, he had intended to walk to a nearby store, but that when Murphy began to question him, he did not feel free to continue walking. The trial court found that defendant did not feel free to leave.

Murphy testified that, at that point, he called for backup on his lapel radio mike, requesting a "Code 1 cover" for his stop. Murphy explained that, because he was engaged in a conversation with defendant and still had not contacted the driver of the stopped car, his attention was divided, and he wanted another officer present for his safety. Murphy explained that a "Code 1 cover" means a nonemergency situation, a "calm, casual pace, not lights and siren or anything like that." Murphy testified that defendant was close enough to hear his call for cover.

Murphy testified that, after he made the call for backup, he asked defendant if he had a crack pipe. At that time, Murphy and defendant were still standing in the same places they had been—Murphy was standing in the street, on the driver's side of his patrol car, and defendant was standing several feet away on the sidewalk. Defendant replied that he did not have a pipe. Murphy then asked defendant if he had anything illegal on him; defendant looked at Murphy and did not reply. Murphy then asked defendant if he would mind if Murphy searched him, and defendant replied, "Yeah, you can search me. Go ahead."

Murphy did not immediately search defendant because, by that time, the backup officer, Yee, had arrived. Murphy testified that he told Yee that defendant had not been patted down or searched and went to talk to the driver. Murphy testified that, at some point, but it is not clear when, he took defendant's name and date of birth and conducted a records check.

Yee testified that, when he arrived, defendant was seated on the curb behind the stopped car. Two reserve officers were already at the scene standing outside of their patrol car, and their patrol car was parked behind Murphy's. Yee

parked behind the reserve officers' car with his overhead lights on.

Yee testified that he asked defendant if he had anything that the officer should be concerned about, and that defendant replied, "No." Yee then asked defendant if he could search him, and defendant replied, "Sure, go ahead." Yee testified that defendant was polite and cooperative. Yee asked defendant to stand up and then conducted a pat-down search, finding the drugs leading to the charges at issue in this case.

Defendant moved to suppress the evidence obtained during the search, contending that an unlawful stop occurred when Murphy continued to question defendant after he denied having a crack pipe. At that point, defendant contended that, considering the totality of the circumstances—including the time of the encounter, the presence of the overhead flashing lights, the high-crime location of the encounter, and the officer's continued questioning—he was stopped for purposes of Article I, section 9.

The trial court struggled with its ruling. It found that defendant subjectively believed that he was not free to leave, stating, "I do believe both that the defendant believed he wasn't free to go; that he would risk harm to try to leave; and that his view of the circumstances under the realities of the street was entirely reasonable." However, the court held that the applicable appellate case law required the conclusion that defendant was not "seized" in the constitutional sense, and it, therefore, denied defendant's motion to suppress.[2] The court then tried defendant on stipulated facts and convicted him of the two charged offenses.

---

[2] The trial court explained:

"The officers did what they were trained to do to keep the conversation just shy of the line that was a stop. They * * * followed what they understood to be * * * the case law * * * and I think they did the correct job of that.

"That case law does, indeed, say that a reasonable person would have to feel that they were not free to go, but the case law also gives us a strong message as to what the Court of Appeals thinks is reasonable.

"And I kind of think they're wrong about that. As a matter of fact, I think the defendant didn't feel that he was free to leave. I think the circumstances of the neighborhood in which officers feel that it's routine to ask people if they've got a crack pipe just because they're there that goes to something of the circumstances.

■     On appeal, defendant asserts that, considering the circumstances (including the hour of the day, the flashing overhead lights, the officer's call for backup, the high-crime location, and the direct questioning of defendant about criminal activity), defendant was stopped when Murphy asked him for consent to search. At that point, defendant contends, defendant reasonably believed that, in light of the circumstances, he was under investigation for criminal activity and therefore was not free to leave. In the state's view, no stop occurred; rather, Murphy engaged defendant in mere conversation, and defendant subsequently voluntarily consented to the search of his person.

■■     The parties have treated this case as a nontraffic, police-citizen encounter, and they have addressed the constitutional ramifications of Murphy's conduct in that context. To be lawful, a stop must be justified by reasonable suspicion of criminal activity. *State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998). To satisfy the reasonable suspicion requirement,

---

"There are overhead lights. The car in which the defendant is a passenger has been stopped by show of authority even though it probably pulled into place by itself. The overhead lights constitute—make it a stop.

"So the overhead lights are on. The defendant is walking freely. He doesn't have to change direction which is kind of significant under the cases and the officer said things which led the defendant to believe that he wasn't free to go. And I believe that.

"And personally I think that was entirely reasonable under * * * the circumstances as he perceived them and there was nothing unreasonable about his perception.

"My understanding of the case law is that's not enough to transport a mere conversation into a stop because the Appellate Courts, the Court of Appeals and the Supreme Court, have given us examples of how much it takes to interfere with a person's liberty and merely engaging them in conversation which has the effect of stopping their forward progress without changing their direction, without summoning them one way or another to move, is not enough to prevent the officer from extracting consent to search or to talk.

"That's what happened here, I believe I'm constrained by appellate case law to deny the motion to suppress.

"However, I do believe both that the defendant believed he wasn't free to go; that he would be risking harm to try to leave; and that his view of the circumstances under the realities of the street was entirely reasonable.

"So I'm frustrated by the disaccord between what the Appellate Courts think is reasonable and what I think is real. But I'm bound by the Appellate Courts in this area. I have not * * * seen a case which tells me I'm not, and, therefore, I deny the motion to suppress."

the officer must subjectively believe that the person has committed a crime and that belief must be objectively reasonable. *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997). The state does not contend that Murphy had reasonable suspicion of criminal conduct when he asked for defendant's consent to search; rather the state contends that the questioning that led to the search of defendant was not a stop, but merely conversation, and that defendant consented to the search.

■■ Under Article I, section 9, of the Oregon Constitution, a stop occurs when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). The determination of whether a person has been stopped and, if so, at what point in the encounter, requires a fact-specific inquiry into the totality of the circumstances. *Id*. at 408.

■ There is no evidence that Murphy intentionally restricted defendant's liberty of movement. Thus, we consider whether defendant was stopped in the second sense. In *State v. Parker*, 225 Or App 610, 614-15, 202 P3d 205, *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009), we said that a *"Holmes* type (b)" inquiry implicates both subjective and objective components—that is, whether the defendant subjectively believed that he or she was significantly restrained and, if so, whether that belief was objectively reasonable. As the party bearing the burden of demonstrating the lawfulness of the search, the state can prevail against a *Holmes* type (b)-based motion to suppress if it disproves either of those conjunctive components. *Id*. That is, the state can prevail by proving either (1) that the defendant did not believe that the officer had significantly restrained or interfered with the defendant's freedom of movement, or (2) that such a belief would not be objectively reasonable. *State v. Ashbaugh*, 225 Or App 16, 24, 200 P3d 149 (2008) (lead opinion), *rev allowed*, 346 Or 257 (2009).

■ Here, the trial court found that defendant subjectively believed that he was not free to leave. In assessing

whether "such a belief is objectively reasonable under the circumstances," the operative inquiry is whether a reasonable person in defendant's position could have believed that the officers had significantly restricted his liberty or freedom of movement. *Id.* at 25.

A consensual police-citizen encounter can become a stop if the encounter causes a person reasonably to believe that he is the subject of a criminal investigation and that, for that reason, his liberty of movement has been significantly restricted. *State v. Hall*, 339 Or 7, 18-19, 115 P3d 908 (2005). In *Hall*, the court held that an officer turned an otherwise consensual encounter into a stop when the officer requested the defendant's identification and then used that identification to conduct a warrant check, because the officer's conduct, by show of authority, interfered with the defendant's freedom of movement. *Id.* at 19. The court explained that a reasonable person would not think that he or she was free to leave when the person is the investigatory subject of a pending warrant check. *Id.*

Defendant contends that this case is analogous to *Hall*, because defendant reasonably believed that, after Murphy asked for consent to search, he was subject to a criminal investigation and was not free to leave. In the state's view, this case is distinguishable from *Hall*, because the officer in that case interfered with the defendant's freedom of movement by taking his identification and using it to conduct a warrant check.

We agree with the state that this case is distinguishable from *Hall* on its facts, because here there was no request for defendant's identification and no warrant check. However, as the lead opinion in *Ashbaugh* recently stated, there is "no meaningful distinction between situations in which awareness of the investigation derives from a warrant check * * * and those in which the awareness of the investigation derives from a request to search following a defendant's denial of wrongdoing," if the request results in a reasonable belief that the person's liberty of movement is significantly restricted. 225 Or App at 25; *see also State v. Lovell*, 233 Or App 381, 388-89, 226 P3d 76 (2010) (holding that an officer's

request to search the defendant's backpack after the defendant denied having anything illegal was a stop); *State v. Zamora-Martinez*, 229 Or App 397, 403-04, 211 P3d 349 (2009) (a reasonable person could believe, after a request for additional identification, that the person was subject to investigation and was not free to leave).

The state contends that this case is analogous to *State v. Baker*, 154 Or App 358, 362, 961 P2d 913, *rev den*, 327 Or 553 (1998), in which we held that it was mere conversation for an officer to ask a person coming out of a known crack house, "[D]id you buy any good crack in there?" This case, like *Baker*, presents an interesting variation on the issue of what type of questioning, short of asking for identification to conduct a warrant check, goes beyond "ordinary social intercourse," and amounts therefore to a seizure under Article I, section 9. However, the facts of the two cases are distinguishable. In *Baker*, after denying that he had anything illegal in his possession, the defendant offered to allow the officer to search. *Id.* at 360. Here, in reply to defendant's nonresponse, the officer asked defendant for consent to search. It is that request for consent, considered in context, that defendant contends gave rise to the stop.

Here, also, the circumstances were more coercive than in *Baker*. In *Baker*, the officer approached the defendant on foot and immediately asked him if he had bought any "good crack." *Id.* Here, when Murphy began questioning defendant, patrol car overhead lights were activated and the car in which defendant had been riding had just been stopped. When Murphy asked defendant whether he could search him, Murphy had already asked defendant if he could speak with him, called for backup, and asked defendant if he was in possession of a crack pipe or anything illegal. Murphy never told defendant that he was free to decline the request for consent to search. Under those circumstances, a reasonable person could infer that Murphy believed that defendant was in possession of something illegal and wanted to investigate further. In light of the circumstances, Murphy's request for consent to search gave rise to a stop; at that point, a reasonable person in defendant's position could have believed that he was not free to leave. *Lovell*, 233 Or App at

388 (an officer stopped the defendant when asking for consent to search her backpack after the defendant denied that she possessed anything illegal); *see Ashbaugh*, 225 Or App at 28 ("[A] person who knows that he or she is being investigated by a police officer during an encounter could reasonably believe that, for that reason, his or her freedom of movement has been restrained."). As the trial court found, defendant did, in fact, believe that he was not free to leave.

The state notes that, in *State v. Morgan,* 226 Or App 515, 203 P3d 927, *rev allowed,* 346 Or 363 (2009), we held that a request for consent to search a person's car, without coercive circumstances, does not implicate the provisions of Article I, section 9. In that case, the defendant was a passenger in a vehicle that had been stopped for a traffic infraction. The driver had been placed under arrest and the arresting officer asked to see the defendant's license to determine whether she had a license to drive so that he could release the vehicle to her. After checking her license and determining that she was the owner of the vehicle, the officer asked the defendant for permission to search. We rejected the defendant's contention that, under those circumstances, the request for consent to search "would cause a reasonable person to believe that his or her liberty or freedom of movement was being restrained." *Id.* at 520. We noted that the officer had lawfully requested to see the defendant's license and that he had not acted in a coercive manner. *Id.* We distinguished *Ashbaugh*, noting that, in *Ashbaugh,* the request to search had been preceded by an unlawful detention of the defendant's person. *Id.* at 520 n 1.

*Morgan* is distinguishable from this case. As we said in *Morgan,* the officer there had a lawful reason to request the defendant's license in order to determine whether she could drive the car. Unlike in this case, the officer had not inquired regarding unlawful activity and had not given the defendant reason to believe that she was being investigated for criminal activity and therefore was not free to leave.

We conclude for the reasons expressed herein that, under the circumstances, defendant was stopped. The stop was not based on reasonable suspicion of criminal activity and was therefore unlawful. The state does not contend that,

if the stop was unlawful, defendant's consent to search was nonetheless voluntary. We conclude that the evidence obtained as a result of the search should have been suppressed.

Reversed.