Argued and submitted January 31, reversed and remanded September 26, 2012, petition for review denied March 28, 2013 (353 Or 428)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

RUSSELL EVERETT ELLIS,
aka Russell Everette Ellis,
*Defendant-Respondent.*

Multnomah County Circuit Court
091034055; A145688

287 P3d 1215

Jeff J. Payne, Assistant Attorney General, argued the cause for appellant. With him on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Ernest G. Lannet, Chief Deputy Defender, argued the cause for respondent. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

This is a state's appeal of a pretrial order granting defendant's motion to suppress evidence. ORS 138.060(1)(c). Defendant was stopped after Portland police officers, some of whom were on the ground in patrol cars and another of whom was conducting aerial surveillance of the area, became suspicious that defendant had just committed a "car prowl."[1] Defendant was ultimately charged with unauthorized use of a motor vehicle (UUMV), possession of a stolen vehicle, and first-degree theft, based on evidence obtained during the stop and the ensuing search of defendant's backpack. The sole issue on appeal is whether the trial court erred in determining that the police officer's subjective belief that defendant had committed a crime was not objectively reasonable under the circumstances.[2] For the reasons explained below, we reverse and remand.

Our standard of review is of particular consequence in this case. We are bound by the trial court's findings of historical fact when there is evidence to support them. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). Then,

> "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts. *State v. Peller*, 287 Or 255, 260, 598 P2d 684 (1979). In addition, if the trial court did not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)."

[1] Neither the officer below, nor the state on appeal, explains what is meant by the term "car prowl"; however, we assume it refers to unlawful entry into a motor vehicle, ORS 164.272(1) ("A person commits the crime of unlawful entry into a motor vehicle if the person enters a motor vehicle, or any part of a motor vehicle, with the intent to commit a crime.").

[2] The state does not dispute the trial court's conclusion that defendant was "stopped" for purposes of Article I, section 9, of the Oregon Constitution. *See State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) ("A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." (Emphasis omitted.)). Nor does defendant dispute that the officer who stopped defendant subjectively believed that defendant had committed a crime.

*State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991). Here, because there is a dispute over whether we must presume that the court rejected some of the officers' testimony and defer to the implied findings of fact that flow from that presumed rejection, we begin by summarizing all of the pertinent evidence adduced at the suppression hearing.

On October 2, 2009, Portland Police Officers Dobbs, Ho, Snitily, and Jackson were among those participating in a burglary mission to combat a "huge increase" in residential burglaries in the Kenton neighborhood of Portland. The mission included police use of undercover cars, marked patrol cars, and an airplane equipped with a FLIR daylight camera system. The FLIR system detects "infrared signatures": objects emitting "heat" (such as a person) appear in a lighter shade than cooler objects, essentially allowing the operator to see in the dark.

At approximately 3:00 a.m., Officer Snitily, who was in an unmarked car doing "spotting" for the mission, saw defendant, who was carrying a backpack, on the west side of Peninsular Avenue, walking southbound. Defendant then crossed through a Walgreen's parking lot and headed down Lombard Street. At that point, Snitily notified Officer Ho, who was operating the FLIR system in the airplane, that defendant "might be somebody we want to keep an eye on."

Officer Ho testified that he located defendant from the air and then watched him

"walk southbound on Atlantic, just south of Lombard. He was wandering around and just—he was just constantly looking around, as if to see if he was being followed. He continued southbound, then reversed direction and started walking northbound on Atlantic, on the west side of the street.

"At that point, when he was approaching Lombard, he started to cross the street towards the east of the— of Atlantic, and stopped approximately 30 feet south of Lombard and just kind of stood in the middle of the street, next to the vehicle that was later identified as [an] '06 Dodge Caravan.

"He was looking around, then he walked up to the vehicle, to the driver's side door. And I saw him get into the vehicle, using the driver's side door, and he was in the

vehicle for probably a couple, three minutes. At that point, he—the car never moved, it never went anywhere. He got back out, using the driver's side door, crossed the street back to the west side of the street, to a business that's on that corner, into the rear parking lot area, where he kind of stood between two dumpsters for about a minute.

"After staying there for about a minute or so, he walked southbound on Atlantic, on the west side of the street, where he was contacted by ground officers."

Ho testified that he asked the ground officers to contact defendant

"[b]ecause of his behavior around that car, prior to entering that car. People don't normally just clear their tail, I like to say, where they've just kind of walked past the car that is their car. Start looking around to see if anybody's watching, then make a U-turn and head back towards the car, stay there a little bit, before even getting into the car. And then when they get into the car, they don't normally just sit in the car and then decide to leave and go straight across the street and kind of like hide out between two dumpsters."

The prosecution also introduced into evidence video footage from the FLIR system camera, on which Ho can be heard describing defendant's movements to officers on the ground. However, Ho began recording images only at the moment defendant was standing at the driver's door of the car looking in, and, therefore, the video does not show defendant "wandering around" and "just constantly looking around, as if to see if he was being followed"; nor does it reflect that defendant walked past the car, then reversed course, and doubled back to the car, as Ho testified.[3] The video does reflect the remainder of defendant's actions as described by Ho: defendant stands by the driver-side door for a moment (about 12 seconds) before getting in, stays in the car for almost four minutes, then gets out of the car the same way he got in and crosses the street toward two dumpsters in a parking lot. He remains near the dumpsters

---

[3] Ho testified that he watched "a lot of different people walking around that night," so, rather than wasting tape, he would start recording only "if it kind of raised my suspicion."

for a little over one minute, but the camera does not reflect what he is doing; he then starts walking southbound.

Officer Dobbs responded to Ho's request to contact defendant, believing, based on Ho's observations, that defendant "had just committed a car prowl" and they needed to investigate. She stopped her patrol car less than 50 feet from defendant, turned on her overhead lights, and activated her spotlight. Officer Jackson arrived in a separate car shortly thereafter. According to Dobbs's testimony, she asked defendant where he was going, and he told her that he "was just walking around" and "didn't live in the area." Dobbs took defendant's name and date of birth and returned to the patrol car to check for warrants. Dobbs also checked the vehicle that defendant was seen getting into, as well as the two dumpsters. Dobbs, who had almost nine years of experience with the Portland Police Bureau, testified that she knew "from prior contacts" that

> "the people that * * * are prolific car prowlers * * * have tendencies to hide the stuff that they might have just stolen from a car into the dumpsters, to pick it up later so that officers won't find that—it on them, at that time, and later they can go pick it up in the dumpster."

Dobbs did not find anything unusual in her check of the dumpsters.

Officer Jackson, meanwhile, continued to talk with defendant, who mentioned that he had been arrested for unauthorized use of a motor vehicle nine times in the past, but had since "changed." He also told Jackson that he had "a crowbar, screwdriver, and some other tools" in his backpack. Jackson noted that defendant had a set of keys, which looked like automotive keys, hanging off his belt. Defendant told Jackson that "he'd found them awhile ago," and he denied knowing what they were for.

After dispatch reported that the car had been stolen, Dobbs read defendant his *Miranda* rights, questioned him about the car, placed him in handcuffs, and arrested him for unlawful use of a motor vehicle. Jackson then asked defendant if he could search his backpack. Defendant replied, "Sure, go ahead. I know you will, anyway." Inside

the backpack, Jackson discovered a "white Dodge key" and "a bunch of little screwdrivers and pliers."

Defendant moved to suppress the evidence discovered during the stop, including his statements and the evidence in the backpack. After a hearing, the court made the following findings:

"So we get to 3 a.m., and the individuals—the police officer sees the defendant in the area. And the—from my viewing of the film that was shown, is that the individual approaches the vehicle, walking straight to the vehicle, it's a van, and the defendant appears to be looking in the window of the van. After a while, the person opens the door, goes in the van, stays there for a little bit, and then leaves.

"The things that strike me as usual [sic] about this type of incident, is that there's no attempt for the person who just got out of the van to leave quickly. *In fact, the individual is tracked to a dumpster, and several things may have occurred. One of them may have been public urination, one of them may have been throwing stuff in the dumpster.*

"*And, in fact, the police officers testified later that when he looked into the dumpster, one dumpster was empty, the other was half full of trash. Nothing unusual.*

"Nonetheless, the defendant is followed by the eye in the sky, if you want to call it that, and there's nothing remarkable about the route he takes.

"* * * * *

"Now, at [the point at which defendant was stopped], * * * I see the police officers had suspicion, and it could be a *Valdez*-type * * * suspicion, but I don't see that as being a reasonable suspicion. Maybe they had a hunch that an individual was, at the very least, into a motor vehicle that didn't belong to him, which would be unauthorized entry of motor vehicle. But we don't know who the vehicle belongs to, and we don't know, at that point, whether or not this individual has a right to be in that vehicle. We're just jumping to a conclusion that he doesn't."

(Emphasis added.)

The court concluded that Dobbs's stop of defendant was not based on reasonable suspicion, and defendant's

consent to the search of his backpack was "acquiescence to authority based on an illegal stop." Consequently, the court granted defendant's motion to suppress. The state appeals that ruling.

As noted, *see* 252 Or App at 383, the only issue on appeal is whether the stop of defendant was lawful.

> "To be lawful, a stop must be justified by reasonable suspicion of criminal activity. *State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998). To satisfy the reasonable suspicion requirement, the officer must subjectively believe that the person has committed a crime and that belief must be objectively reasonable. *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997)."

*State v. Levias*, 239 Or App 116, 121-22, 243 P3d 880 (2010), *adh'd to as modified on recons*, 242 Or App 264, 255 P3d 611 (2011). For an officer's belief to be objectively reasonable, the officer must "be able to point to specific and articulable facts, interpreted in the light of the existing circumstances and [the officer's] experience, that [the person] ha[s] committed a crime." *State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011). Although a police officer's training and experience are relevant considerations, *see, e.g.*, *State v. Berry*, 232 Or App 612, 617, 222 P3d 758 (2009), *rev dismissed*, 348 Or 71 (2010), those factors alone are not sufficient to justify a stop, *see, e.g.*, *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977) ("in the absence of any very remarkable activity," an officer's instinct and experience is insufficient to provide reasonable suspicion of a crime). That there is a possibly innocent explanation for a defendant's behavior does not negate the reasonableness of the suspicion of criminal conduct. *State v. Hammonds/ Deschler*, 155 Or App 622, 626, 964 P2d 1094 (1998).

Here, the state contends that Dobbs's belief that defendant had just committed a car prowl was objectively reasonable under the circumstances—including the "high crime" in the area, the time of day, defendant's movements before approaching the car, his staying in the car for four minutes without moving it, his heading "immediately" for the dumpsters upon leaving the car, and Dobbs's experience that car prowlers will often hide stolen goods in dumpsters—and the court erred in concluding otherwise.

The state argues that the trial court "incorrectly evaluated the evidence," pointing to (1) the court's reliance on possible lawful explanations for defendant's behavior and (2) the court's use of evidence gathered *after* Dobbs stopped defendant to evaluate whether the reasonable suspicion standard was satisfied.

We agree with the state that the trial court appears to have applied an incorrect legal framework in assessing whether Dobbs's suspicion that defendant had committed a crime was objectively reasonable. First, the court reasoned that there were other, possibly benign, explanations for defendant's actions near the dumpsters—specifically, "[o]ne of them may have been public urination, one of them may have been throwing stuff in the dumpster." However, as we made clear in *Hammonds / Deschler*, 155 Or App at 626, "the fact that there are possible lawful explanations for behavior does not mean that the behavior may not give rise to a reasonable suspicion of criminal conduct." *See also State v. Mitchele*, 240 Or App 86, 92 n 2, 251 P3d 760 (2010) (same); *State v. Nguyen*, 229 Or App 719, 728, 212 P3d 1284 (2009) (same).

In determining that the officer lacked reasonable suspicion to stop defendant, the trial court also noted that nothing was later found in the dumpster. Again, it found:

"And, in fact, the police officers testified later that when [they] looked into the dumpster, one dumpster was empty, the other was half full of trash. Nothing unusual."

That information, too, is irrelevant. The relevant time period for determining whether an officer's suspicion of criminal behavior was objectively reasonable is "the time * * * the peace officer acts." ORS 131.605(6). Evidence acquired after a stop cannot be used to establish or negate reasonable suspicion *for* the stop.

Defendant disagrees that the court's analysis was misguided, arguing that "the standard of review [should not] allow for such conclusions." Under the proper standard, defendant insists, we should instead *infer* from the court's comments that it rejected the officers' testimony about defendant's suspicious behavior and defer to those implicit findings. For example, regarding the court's statement about possible lawful explantions

for defendant's presence near the dumpsters, defendant argues, "The [court's] point is that defendant could have been there doing *anything* and that the officers' inferences about defendant's presence between the dumpsters were naked speculation and, therefore, not a basis for *reasonable* suspicion." (Emphasis in original.) Defendant further asserts that, in context, "[t]he trial court's observation that a subsequent examination of the dumpsters did not reveal anything amiss was merely another fact to support its finding that the officers' musings about defendant's behavior near the dumpsters were not credible."

Defendant's argument reaches too far. As noted above, under our standard of review, we will, in some circumstances, presume that the trial court decided disputed facts consistently with its ultimate conclusion. However, invocation of that factual presumption is necessarily dependent on the trial court's application of the correct legal analysis. If the court is operating under a misunderstanding as to the applicable legal principles—as is the case here—we will not infer that the court decided facts consistently with that erroneous legal construct.[4] Accordingly, we reject defendant's argument and reverse and remand for the trial court to reconsider the evidence in light of the correct legal test.[5]

Reversed and remanded.

---

[4] We note also that the trial court failed to make any findings regarding defendant's behavior during the time before the camera began recording—that is, before defendant appeared next to the door of the car. Officer Ho's uncontroverted testimony on that point was that defendant was "wandering around and just—he was just constantly looking around, as if to see if he was being followed," that he walked past the car, then reversed course and headed back towards the car, and he stood in the middle of the street near the car before getting into it, evidence that, if believed, would bear on the reasonable suspicion inquiry. The court also failed to address Dobbs's testimony that car prowlers often hide things in dumpsters that they have stolen from cars. Both of those features are significant to a correct assessment of reasonable suspicion in this case. *See State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002) (reasonable suspicion as a basis for a stop is to be determined "in light of the totality of the circumstances"); *State v. Chambers*, 69 Or App 681, 686, 687 P2d 805 (1984) ("[T]he significance of any of the facts may be enhanced by the officer's special knowledge of the way certain crimes * * * are committed[.]").

[5] Given that disposition, we do not address the state's argument that defendant voluntarily consented to the search of his backpack, except to note that the state does not address whether, if the stop was unlawful, the evidence discovered in defendant's backpack is nonetheless admissible because it was not the product of that unlawful conduct. *See Hall*, 339 Or at 21 ("Article I, section 9, may require exclusion of evidence from an otherwise valid consent search upon the ground that defendant's consent derived from a preceding violation of the defendant's rights under that state constitutional provision.").